Certified Copy

## In the Matter Of:

## WELLS FARGO vs. NORTHERN ROCKIES

12-CV-221-J

## JOHN SCHNEIDER, M.D.

*August 13, 2013*

*Non-Confidential*



800.211.DEPO (3376)
*EsquireSolutions.com*

Case 2:12-cv-00221-ABJ   Document 33-7   Filed 10/10/13   Page 2 of 42

JOHN SCHNEIDER, M.D.  Non-Confidential                August 13, 2013
WELLS FARGO vs. NORTHERN ROCKIES                                    1

1             IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF WYOMING

3    ------------------------------------------------------------

4    WELLS FARGO BANK, N.A.,            )
     a national bank,                   )
5                                       )
                   Plaintiff,           )
6                                       )
          vs.                           )     Case No. 12-CV-221-J
7                                       )
     NORTHERN ROCKIES NEURO-SPINE,      )
8    P.C., a Wyoming corporation,       )
     JOHN H. SCHNEIDER, MICHELLE        )
9    SCHNEIDER, SCHNEIDER LIMITED       )
     PARTNERSHIP, a Wyoming limited     )
10   Partnership, JOHN SCHNEIDER        )
     REVOCABLE TRUST U/A/D              )
11   NOVEMBER 20, 2007, MICHELLE        )
     SCHNEIDER REVOCABLE TRUST          )
12   U/A/D NOVEMBER 20, 2007,           )
     SCHNEIDER MANAGEMENT, LLC,         )
13   a Wyoming limited                  )
     liability company,                 )
14                                      )
                   Defendants.          )
15
     ------------------------------------------------------------
16               NONCONFIDENTIAL TESTIMONY

17           DEPOSITION OF JOHN SCHNEIDER, M.D.
                 Taken in behalf of Plaintiff
18
                    9:25 a.m., Tuesday
19                   August 13, 2013

20           PURSUANT TO NOTICE, the deposition of

21   JOHN SCHNEIDER, M.D., was taken in accordance with the

22   applicable Wyoming Rules of Civil Procedure at the

23   offices of Worrall and Greear, 1112 Robertson Avenue,

24   Worland, Wyoming, before Alexis Anderson, Court Reporter

25   and Notary Public of the State of Wyoming.



Case 2:12-cv-00221-ABJ   Document 33-7   Filed 10/10/13   Page 3 of 42

JOHN SCHNEIDER, M.D.  Non-Confidential                    August 13, 2013
WELLS FARGO vs. NORTHERN ROCKIES                                       2

1                       A P P E A R A N C E S

2

     For the Plaintiff:      JAMES R. BELCHER
3                            Belcher & Boomgaarden, LLP
                             237 Storey Boulevard, Suite 110
4                            Cheyenne, Wyoming 82009

5     For the Defendants:     DAVID M. CLARK
                             Worrall & Greear, PC
6                            1112 Robertson Avenue
                             P.O. Box 552
7                            Worland, Wyoming 82401-0552

8

9                              INDEX
                                                          PAGE
10   DEPOSITION OF JOHN SCHNEIDER, M.D.:

11   Examination by Mr. Belcher                             3

12

13                      INDEX TO EXHIBITS

14   EXHIBIT                                         IDENTIFIED

15   3           Promissory note                            8

16   4           Commercial Guaranty                        8

17   5           Commercial Guaranty                        9

18   6           Letter                                    31

19   7           June 13th and 14th e-mails                31

20   8           Newspaper clippings                       33

21   9           E-mail                                    53

22   10          Order of suspension                       56

23   11          May 2012 financial statement              65

24   12          November 2001 financial statement         65

25   13          September 2010 financial statement        69



Case 2:12-cv-00221-ABJ   Document 33-7   Filed 10/10/13   Page 4 of 42

JOHN SCHNEIDER, M.D.  Non-Confidential                    August 13, 2013
WELLS FARGO vs. NORTHERN ROCKIES                                        4

1   myself.  So please let me finish my questions before you

2   give your answers, and I'll try and let you finish your

3   answers before I ask another question.  Okay.

4        A.    Fair enough.

5        Q.    First, I'd like to ask you about your

6   experience with Shoshone Bank in Cody, Wyoming, before

7   Wells Fargo acquired it.  Do you recall having deposit

8   accounts at Shoshone Bank?

9        A.    I do.

10       Q.    Do you know approximately when?

11       A.    2005, I believe, 2006 prior to Wells Fargo

12  purchase of Shoshone Bank.

13       Q.    Okay.  Do you remember the nature of the

14  accounts, checking accounts, savings accounts,

15  certificates of deposit, things like that?

16       A.    All of the above, plus corporate accounts.

17       Q.    Do you recall having any personal loans with

18  Shoshone Bank?

19       A.    I do.

20       Q.    Can you give us a summary of those.

21       A.    As I recall, loans were for land purchase and

22  home and ranch development in Powell, Wyoming.

23       Q.    Do you recall having any business loans with

24  Shoshone Bank?

25       A.    I do not.



Case 2:12-cv-00221-ABJ   Document 33-7   Filed 10/10/13   Page 5 of 42

JOHN SCHNEIDER, M.D.  Non-Confidential                    August 13, 2013
WELLS FARGO vs. NORTHERN ROCKIES                                        5

1    Q.    Can you tell us the bank officers that you

2    dealt with at Shoshone Bank.

3    A.    I believe at that time Glenn Ross was the vice

4    president of Shoshone Bank and dealt with him

5    specifically on my accounts, and I met the president, I

6    think Peterson was his last name, peripherally but

7    primarily Glenn Ross.

8    Q.    Do you recall whether you guaranteed any loans

9    for businesses at Shoshone Bank?

10   A.    I do not recall guaranteeing any loans for

11   businesses.

12   Q.    Can you explain the approval process for

13   obtaining loans at Shoshone Bank to the best of your

14   recollection.

15   A.    I believe it was based upon my assets and

16   specifically my income as to whether I would be able to

17   pay a loan back that I was requesting from a bank.

18   Q.    Okay.  Do you recall what approval process the

19   bank had internally to approve the loans once you applied

20   for them?

21   A.    I don't.

22   Q.    I'm going to ask you now a little bit about

23   Northern Rockies Neuro-Spine, and I may refer to it as

24   NRNS just because it might simplify things.  Do you

25   recall the first loan that NRNS ever procured from Wells



Case 2:12-cv-00221-ABJ   Document 33-7   Filed 10/10/13   Page 6 of 42

JOHN SCHNEIDER, M.D.  Non-Confidential                    August 13, 2013
WELLS FARGO vs. NORTHERN ROCKIES                                        6

1  Fargo Bank?

2      A.    I don't recall the first loan, if it was a

3  loan, other than for the building construction in

4  Billings.

5      Q.    Help me understand that.  My understanding is

6  what's been referred to in various papers as that being

7  the OMNI project; is that correct?

8      A.    Correct.

9      Q.    So did NRNS borrow money to be used for the

10 OMNI project?

11     A.    Correct.

12     Q.    Okay.  Can you tell us what you recall about

13 that.

14     A.    The specifics of the loan or the OMNI project?

15     Q.    I'll try and clarify it a little better.  I'm

16 not talking about what I'm going to refer to as the TI

17 loan for tenant improvement.  Are we talking -- did NRNS

18 borrow money for a different purpose from Wells Fargo for

19 the OMNI project?

20     A.    Well, NRNS is a signer on the overall building

21 development, more than just the TI loan that you refer.

22     Q.    Okay.  Isn't there a different entity that owns

23 the OMNI project?

24     A.    You are correct.

25     Q.    Okay.  And is that entity that owns the OMNI



Case 2:12-cv-00221-ABJ   Document 33-7   Filed 10/10/13   Page 7 of 42

JOHN SCHNEIDER, M.D.  Non-Confidential                    August 13, 2013
WELLS FARGO vs. NORTHERN ROCKIES                                        7

1    project the borrower under the OMNI project loan?

2        A.    The borrower on the overall OMNI project loan,

3    I believe, is different than the TI loan borrower.

4        Q.    Okay.  So with that background, do you recall

5    whether NRNS borrowed any money from Wells Fargo

6    specifically for the OMNI project construction?

7        A.    I believe the answer is no.

8        Q.    Okay.  Can you describe the OMNI project just

9    generally so we have it on the record.

10       A.    OMNI project is a 25,000-square foot building

11   located in Billings, Montana, subserving musculoskeletal

12   and spine physicians with investors including

13   orthopedics, neurosurgery, anesthesiology, radiology for

14   the care and management of musculoskeletal diseases in

15   the region.

16       Q.    And my understanding is the entity we were

17   talking about earlier is ONI Realty Investors, LLC, that

18   owns the OMNI project.  Does that sound correct?

19       A.    That's correct.

20       Q.    Is the OMNI project building completed?

21       A.    It is.

22       Q.    Is it operational?

23       A.    It's functional.

24       Q.    Is it occupied?

25       A.    No, except for radiology.



1    Q.    I'm going to refer to this other loan as the TI

2  loan.  Just to make sure we're talking about it, that's

3  the loan at issue in this lawsuit, and please confirm

4  this is correct:  NRNS borrowed money from Wells Fargo to

5  complete space that NRNS was going to occupy in the OMNI

6  project; is that accurate?

7    A.    It is.

8                    (Deposition Exhibit 3 marked for

9                     identification.)

10   Q.    (BY MR. BELCHER)  Dr. Schneider, the court

11 reporter's handed you what's labeled Exhibit 3.  It's a

12 promissory note, and up in the upper right-hand corner,

13 it's dated May 23rd, 2011.  I'm going to ask you to take

14 just a second to review that if you would, please.

15   A.    I've reviewed it.

16   Q.    Did you sign this promissory note?

17   A.    I did.

18   Q.    And just to be certain, who are the owners of

19 Northern Rockies Neuro-Spine, P.C.

20   A.    John H. Schneider, M.D., P.C.

21   Q.    Just you?

22   A.    Correct.

23                    (Deposition Exhibit 4 marked for

24                     identification.)

25   Q.    (BY MR. BELCHER)  Dr. Schneider, the court



Case 2:12-cv-00221-ABJ   Document 33-7   Filed 10/10/13   Page 9 of 42

JOHN SCHNEIDER, M.D. Non-Confidential                    August 13, 2013
WELLS FARGO vs. NORTHERN ROCKIES                                      10

1    Greear, Worland, Wyoming.  I apologize, I think I am the

2    trustee of that trust.  I stand corrected.

3        Q.    Do you know if there are other trustees of that

4    trust?

5        A.    I don't believe so.

6        Q.    I'd like to talk some about this OMNI project

7    loan.  Do you remember when that loan was first discussed

8    with Wells Fargo Bank?

9        A.    I believe it was in the early 2009.

10       Q.    Can you talk a little bit about the initial

11   discussions for that, I'm going to call it the OMNI loan

12   just to be simple.

13       A.    Well, clearly a loan is necessary in order to

14   complete the building construction for the project that

15   we've discussed in Billings, Montana.  That project was

16   conceived and spearheaded by myself with several other

17   physicians from Wyoming.  It was discussed in its infancy

18   stages with Mr. Ross as president of Wells Fargo, and

19   Mr. Ross offered and requested to look at the project to

20   consider whether Wells Fargo would provide a loan for the

21   development of that project.

22       Q.    At the time the original discussions took

23   place, had there been architectural drawings made?

24       A.    No, I don't believe so.

25       Q.    Okay.  But the concept had been determined and



1   then discussed with the bank, Wells Fargo Bank?

2       A.      Correct.

3       Q.      Okay.  Where did those -- where did that first

4   loan discussion take place?  Do you recall?

5       A.      Cody, Wyoming, at the Wells Fargo Bank.

6       Q.      Was there anyone besides Mr. Ross that were

7   involved in that original discussion with you?

8       A.      I don't recall other individuals.

9       Q.      Was there anyone besides you that met with

10  Mr. Ross for that first discussion?

11      A.      No.

12      Q.      Help me, if you will, understand what took

13  place after that before that loan was closed.  And so

14  let's talk about, did the bank require that there be

15  architectural drawings?

16      A.      Well, in the early stages of the OMNI project,

17  there was more prior to discussion in any detail of the

18  loan since I'm not a builder -- I have no idea what a

19  project like that would require -- conversations with

20  other partners, including Meridian Healthcare, Samples

21  Property, and other physicians interested in the project

22  had occurred.  From those conversations, the concept and

23  what would be required was developed.  Along the process

24  of that development, because Mr. Ross acted as both a

25  personal and corporate banker, he requested to be kept

Case 2:12-cv-00221-ABJ   Document 33-7   Filed 10/10/13   Page 11 of 42

JOHN SCHNEIDER, M.D.  Non-Confidential                August 13, 2013
WELLS FARGO vs. NORTHERN ROCKIES                                    12

1  informed as to the nature of those conversations and that

2  process.  And I had a personal relationship, professional

3  relationship with Mr. Ross so I had no difficulty or

4  hesitation in sharing those early discussions with him.

5          Once the project began to mature, architectural

6  drawings became necessary.  After the solicitation of

7  funds for investment in the ONI Realty, which owns the

8  building.  I required no assistance in meeting the

9  capital call to become a partner in ONI Realty, and at

10  that point once that ONI Realty partnership was

11  developed, specific conversations about the economic

12  requirements for the entire building took place.

13      Q.    Okay.  You talked about these partner

14  discussions, and you mentioned various other doctors and

15  entities involved in it.  Did they express their interest

16  in participating in this as equity owners?

17      A.    Yes.

18      Q.    And then was there a determination made as to

19  who was going to put up how much equity capital?

20      A.    Yes.

21      Q.    And so once that had been formulated, is it

22  fair to say then you went to the second phase of

23  architectural drawings, construction estimates, and

24  things along those lines?

25      A.    That's accurate.



Case 2:12-cv-00221-ABJ   Document 33-7   Filed 10/10/13   Page 12 of 42

JOHN SCHNEIDER, M.D.  Non-Confidential                    August 13, 2013
WELLS FARGO vs. NORTHERN ROCKIES                                      13

1    Q.    Okay.  And was that shared with Wells Fargo

2  Bank?

3    A.    Yes.

4    Q.    Do you recall Wells Fargo Bank's approval

5  process for the OMNI loan?

6    A.    Well, I'm not in the banking industry, so I

7  believe they collected what they deemed as necessary

8  information from the various entities and did their own

9  internal assessment.  That's as much as I know about

10  their process.

11    Q.    Do you know if any of this went to a commercial

12  construction loan department or things along those lines?

13    A.    I don't know.

14    Q.    Do you know how long the time period was

15  between your first discussion with Wells Fargo Bank in

16  early 2009 and when the OMNI loan closed?

17    A.    Well, I know when the OMNI loan closed based

18  upon -- I'm not sure you provided me with those documents

19  in an exhibit.  I'd have to look at the closing

20  signatures.  I believe conversations were over perhaps a

21  year.

22    Q.    Okay.  Were loan advances then made on the OMNI

23  loan as construction progressed?

24    A.    Yes.

25    Q.    In other words, all of the loan proceeds



```
 1   weren't distributed at the same time?

 2       A.    Correct.

 3       Q.    How long did it take to construct the OMNI

 4   project from the date the loan closed until it was

 5   completed?

 6       A.    I believe that was 14 months.

 7       Q.    And what transpired once the OMNI project was

 8   completed as it relates to the OMNI loan?

 9       A.    I believe it was converted to a long-term loan

10   to ONI Realty.

11       Q.    And ONI Realty is the owner of the OMNI

12   project, correct?

13       A.    Correct.

14       Q.    And I think you said that there's only one

15   tenant in the OMNI project, and that's a radiology group;

16   is that accurate?

17       A.    That's not accurate.  There's -- the OMNI

18   project has tenants in, I believe, 90 percent of the

19   building, including orthopedic surgeons, neurosurgeons, a

20   surgical center, radiology.  There's a small bit of white

21   space that's yet to be developed inside the building, but

22   otherwise the rest of the building is leased but just not

23   occupied.

24       Q.    Okay.  Is the radiology group the only tenant

25   that occupies a portion of the building?
```



Case 2:12-cv-00221-ABJ   Document 33-7   Filed 10/10/13   Page 14 of 42

JOHN SCHNEIDER, M.D.  Non-Confidential                    August 13, 2013
WELLS FARGO vs. NORTHERN ROCKIES                                        15

1    A.    The -- again, please define occupied.  There

2    every day or -- because I occupy it.

3    Q.    Okay.

4    A.    Orthopedic occupies it.  The surgical center

5    occupies it.

6    Q.    Okay.  People that are operating a business

7    from that location.

8    A.    The -- there are currently no business

9    operations active at that location, but we all -- each of

10   the tenants that I've described have offices and occupy

11   the building.

12   Q.    Are any of the tenants providing patient

13   services from that location?

14   A.    I don't believe so.

15   Q.    Okay.  Is the OMNI project listed for sale?

16   A.    It is.

17   Q.    How long has it been on the market?

18   A.    Well, let me retract that yes and say that

19   Samples Property has solicited other potential investors

20   and/or buyers for the project.  There are no for sale

21   signs listed, and I'm not sure that it's on the open

22   market.

23   Q.    Is the owner of the OMNI project interested in

24   selling the project?

25   A.    ONI Realty has expressed interest in selling



Case 2:12-cv-00221-ABJ   Document 33-7   Filed 10/10/13   Page 15 of 42

JOHN SCHNEIDER, M.D.  Non-Confidential                    August 13, 2013
WELLS FARGO vs. NORTHERN ROCKIES                                      16

1   the project.

2        Q.    Okay.  Let's turn to what we've discussed as

3   the TI loan, which is the loan at issue in this

4   litigation.  Do you recall when that loan was first

5   discussed with Wells Fargo Bank?

6        A.    Well, the nature of the construction -- and

7   this is the first office building I've ever constructed

8   so the concept of a TI loan or tenant improvement costs

9   was delivered from Samples Property, who is the developer

10  of the project.  Based upon an individual's desire and

11  result for their office suite, a cost above the

12  construction of their basic suite was necessary, and that

13  is called -- that was ascribed to the cost for tenant

14  improvement above and beyond what the allocation was in

15  the basic building instruction.  So sometime after the

16  signature for the overall project occurred and the

17  completion of an individual suite, the tenant

18  improvement -- the tenant improvement requirement was

19  discussed, and since I did not have the capital to pay

20  for that, I discussed with Wells Fargo the need for a

21  tenant improvement loan.  And that would have been -- I

22  believe it was perhaps late 2009, maybe early 2010.

23       Q.    Let me see if I understand this.  So would this

24  be fairly accurate:  The OMNI project was actually going

25  to construct the shell of the building and, say, interior



Case 2:12-cv-00221-ABJ  Document 33-7  Filed 10/10/13  Page 16 of 42

JOHN SCHNEIDER, M.D.  Non-Confidential                    August 13, 2013
WELLS FARGO vs. NORTHERN ROCKIES                                        17

1  walls for each tenant, and from that point, it became the

2  tenant's responsibility to finish their space; is that a

3  fairly accurate summary?

4              MR. CLARK:  Objection, compound question.

5       A.    The tenant improvement, the requirement of the

6  developer and builder was to allocate a certain amount of

7  money per square foot to create that shell, but it was

8  more than a shell.  There was potentially finish on the

9  walls, carpet on the ground based upon the number that

10  they allocated to the individual, and I think that was

11  $45 per square foot.  The decisions above that for the

12  particular suite as to how the physician or the surgery

13  center or the radiology group wanted to finish out their

14  lease space then created the need for capital for tenant

15  improvements.  From that the tenant improvement loan was

16  procured from Northern Rockies Neuro-Spine from Wells

17  Fargo.

18       Q.    (BY MR. BELCHER)  Thank you.  So let's go to

19  your recollection of that first discussion about the TI

20  loan.  Do you recall where that discussion took place?

21       A.    Would have been in Glenn Ross's office in Cody,

22  Wyoming.

23       Q.    Do you recall who all was in attendance for

24  that first discussion?

25       A.    I believe at that point, Mr. Ross was working



Case 2:12-cv-00221-ABJ   Document 33-7   Filed 10/10/13   Page 17 of 42

JOHN SCHNEIDER, M.D.  Non-Confidential                    August 13, 2013
WELLS FARGO vs. NORTHERN ROCKIES                                      18

1  closely with Derek Moore who took point on much of the

2  project for Wells Fargo.  So I believe Mr. Moore was,

3  myself and Mr. Ross were in attendance.

4       Q.    Just the three of you?

5       A.    I believe so.

6       Q.    Can you tell us what you recall from that

7  discussion.

8       A.    Well, my intent is in projecting what I am able

9  to do relative to the overall project beyond the

10 building; that is, hiring additional staff, expanding

11 outreach clinics, et cetera, is to look for the most

12 stable long-term debt relationship that I would have with

13 whatever entity I was borrowing.  So my conversations

14 with Mr. Ross and Mr. Moore were to meet the needs of

15 this tenant improvement loan that I acquired and to do so

16 in the most stable commercial loan setting so that I

17 could predict what my long-term costs of that loan would

18 be relative to the Northern Rockies Neuro-Spine cash

19 flow.

20      Q.    So what did you tell them at that first

21 meeting?

22      A.    I will need money but we don't know how much to

23 complete my suite that Northern Rockies Neuro-Spine has

24 signed a lease for, and I will need that -- and I would

25 like that loan to be a long-term loan so that I can



Case 2:12-cv-00221-ABJ   Document 33-7   Filed 10/10/13   Page 18 of 42

JOHN SCHNEIDER, M.D.  Non-Confidential                    August 13, 2013
WELLS FARGO vs. NORTHERN ROCKIES                                      19

1   project what my monthly capital -- what my monthly

2   expenditures for Northern Rockies Neuro-Spine will be in

3   addition to the other expenses, such as the lease.

4        Q.    Do you recall anything else in that initial

5   discussion beyond the fact that you were going to need

6   money for tenant improvements and that you were

7   interested in a long-term loan?

8        A.    I don't recall.

9        Q.    You've mentioned Glenn Ross and Derek Moore.

10  Do you recall having any discussions with any other Wells

11  Fargo Bank representatives regarding the TI loan before

12  it closed at any time?

13       A.    Please clarify closure of a loan.  Is that when

14  we sign, or is that when the loan is -- when the loan

15  term is complete?

16       Q.    When you signed papers and delivered them to

17  Wells Fargo Bank.

18       A.    I believe that Derek Moore and Mr. Ross were

19  the only people I had a conversation with.

20       Q.    Okay.  Are you familiar with the internal loan

21  approval process of Wells Fargo in approving the TI loan?

22       A.    Very peripherally.

23       Q.    Can you tell us peripherally what you

24  understood was required.

25       A.    Well, my understanding is only based upon the



Case 2:12-cv-00221-ABJ   Document 33-7   Filed 10/10/13   Page 19 of 42

JOHN SCHNEIDER, M.D. Non-Confidential                    August 13, 2013
WELLS FARGO vs. NORTHERN ROCKIES                                      20

1   documents provided in this litigation that I reviewed

2   that were generated from the commercial lender prior to

3   this deposition.  Mechanics of what they do to approve, I

4   do not know other than requesting a list of what my

5   assets and liability are, like any loan.

6       Q.    Now, my understanding is that you claimed that

7   Wells Fargo promised it would convert the TI loan to a

8   long-term loan at maturity; is that correct?

9       A.    Correct.

10      Q.    Can you tell me every person that made that

11  promise to you.

12      A.    Glenn Ross made that promise, and Mr. Moore, I

13  believe, was present during those conversations in which

14  I expressed a desire in the inception of the loan to have

15  a long-term loan, not one that would change.  I look at

16  it no different than a housing -- if I were to take a

17  mortgage out on a house, I would not do an ARM.  I would

18  not do a mortgage that had an ARM associated with it.

19  It's just too -- the potential rates I would rather know

20  and have a long-term loan set up at its inception so I

21  know what my costs will be on month one, month 12, month

22  20.  And so the conversations and my expressed desire was

23  to have a long-term loan in its inception.  Mr. Ross,

24  however, indicated that it was necessary to have a

25  construction loan that would mature in a year, and then a

Case 2:12-cv-00221-ABJ  Document 33-7  Filed 10/10/13  Page 20 of 42

JOHN SCHNEIDER, M.D.  Non-Confidential                    August 13, 2013
WELLS FARGO vs. NORTHERN ROCKIES                                      21

1   long-term loan would be granted at that time to convert

2   whatever the debt was.  We didn't know what the debt

3   would be.  We didn't know how much it would actually cost

4   to complete the tenant improvements.  So that amount at

5   the anniversary of or the completion of that construction

6   loan would convert to a long-term loan similar to what

7   ONI Realty was doing for the overall building.

8        Q.    Let me make sure I understand this.  Glenn Ross

9   was the only one that promised you that it would be

10  converted to a long-term loan; is that correct?

11       A.    Well, Glenn Ross is the only person that had

12  the authority to do that.  Mr. Moore worked for Glenn

13  Ross and was present in those conversations.

14       Q.    Mr. Moore was present in those conversations,

15  but he did not make that promise; is that correct?

16       A.    I don't recall a specific conversation where he

17  made that promise.

18       Q.    Okay.  Do you recall when that promise of a

19  long-term loan was first made to you?

20       A.    The inception of the conversation about the TI

21  loan in its inception, as I discussed with Mr. Ross, my

22  desire was to have a fixed monthly expense long-term for

23  the tenant improvements, long-term being that

24  10-to-15-year commercial loan.

25       Q.    So at the time you first inquired about the TI



Case 2:12-cv-00221-ABJ   Document 33-7   Filed 10/10/13   Page 21 of 42

JOHN SCHNEIDER, M.D. Non-Confidential                    August 13, 2013
WELLS FARGO vs. NORTHERN ROCKIES                                    22

1   loan, is it my understanding that Mr. Ross promised at

2   the time in, I believe you said, late 2009 or early 2010

3   that a loan like the TI loan would be converted to a

4   long-term loan?

5       A.      Correct.   That the TI loan -- Mr. Ross

6   indicated that the best option for me was to have a

7   one-year construction loan for tenant improvements.   And

8   at the term of that loan, it would be converted --

9   whatever that debt was would be converted to a note that

10  would be 10 to 15 years based -- similar to what ONI

11  Realty was doing for the overall construction of the

12  building and its conversion to a long-term note.

13      Q.      In looking at the allegations in this

14  litigation, apparently there was a meeting that took

15  place on April 24th, 2011.   Do you recall that meeting?

16      A.      I had many meetings with Mr. Ross, and I don't

17  recall that specific date.   But I'm sure I'll be able to

18  answer your question.

19      Q.      Okay.   Well, I want to ask you if the

20  allegations in your pleadings in this case are accurate

21  to the best of your knowledge.

22      A.      They are.

23      Q.      Okay.   So just so I can tell you the questions

24  I'm going to ask, the allegations are that a meeting took

25  place on April 24th, 2011, another meeting took place on



1  May 18th, 2011, and another meeting took place May 19th,

2  2011.  So I want to ask you about those three meetings.

3       A.    All right.

4       Q.    Do you recall at the April 24th, 2000 [sic]

5  meeting who was in attendance?

6       A.    Mr. Ross and I believe -- I believe only

7  Mr. Ross.

8       Q.    Do you recall in that meeting what Mr. Ross

9  said to you about a long-term loan for the TI loan?

10      A.    Nature of our conversation about long-term loan

11 was at the inception and the request of the loan, and

12 Mr. Ross had indicated that it was not in my best

13 interests to have this loan as a long-term loan; that a

14 construction loan maturing in a year was the only option,

15 and that it would be converted to a long-term loan at the

16 term of the construction loan.  After those

17 conversations, I did not have repeat conversations with

18 Mr. Ross about that particular fact.  I had many meetings

19 with Mr. Ross discussing the development of the project,

20 seemed to be a construction delay associated with the

21 project, and I had ongoing assumption that my loan would

22 be converted to a long-term loan similar to the ONI

23 Realty long-term loan for the overall building.

24      Q.    So you don't recall that he repeated these

25 promises to convert this to a long-term loan at every



Case 2:12-cv-00221-ABJ   Document 33-7   Filed 10/10/13   Page 23 of 42

JOHN SCHNEIDER, M.D.  Non-Confidential                    August 13, 2013
WELLS FARGO vs. NORTHERN ROCKIES                                      24

1    meeting that you had regarding the OMNI project?

2        A.    Oh, I'm sure we didn't bring that topic up

3    every time we met.

4        Q.    Okay.  You mentioned that Mr. Ross told you

5    that it was in your best interests to have a one-year --

6    or I'm going to call it a one-year construction loan, a

7    short-term construction loan for the TI loan; is that

8    correct?

9        A.    Correct.

10       Q.    Why -- why did he explain to you that was in

11   your best interests?

12       A.    I had -- as I indicated, I'd had a long-term

13   relationship with Mr. Ross, and at his introduction with

14   other members of the Wells Fargo team, such as wealth

15   management, over the course of time much like a

16   doctor-patient relationship, he developed an implicit

17   trust in the person you're doing business with.  And

18   Mr. Ross is a banker who I believe had my best interests

19   at heart relative to what I was trying to do both

20   personally and as well as professionally.  So if Mr. Ross

21   had indicated that the best available or the only

22   available options to me were this one-year note that

23   would convert at the completion of the loan to a

24   long-term note, I took him at his word.  I didn't

25   question percentage rates and differentials.  I trusted

Case 2:12-cv-00221-ABJ  Document 33-7  Filed 10/10/13  Page 24 of 42

JOHN SCHNEIDER, M.D.  Non-Confidential                     August 13, 2013
WELLS FARGO vs. NORTHERN ROCKIES                                        26

1    loan with Mr. Ross at your ranch in Powell?

2        A.    The conversations for overall construction and

3    specifically the needs for TI loans were discussed at

4    that meeting because Mr. -- Samples Property, Mark

5    Samples from Samples Property who was the developer for

6    which he presented not only the overall cost of the

7    project but what would be required of the individuals who

8    are leasing suite space, and Mr. Ross was in attendance.

9    So the concept of a TI loan or concept of the need for TI

10   money was discussed during that meeting.

11       Q.    But not specifically the NRNS TI loan; is that

12   correct?

13       A.    Correct.

14       Q.    This is going to be redundant, but I need to

15   ask these questions.  So let's move to May 18th, 2011.

16   Do you recall who's in attendance at this meeting?

17       A.    Mr. Ross was in attendance to that meeting, and

18   at some point Mr. Moore was no longer employed by Wells

19   Fargo.  And I believe Liz Romine and Holly Moen, two

20   other employees at Wells Fargo, participated in the

21   meeting in question.

22       Q.    Do you recall any specific discussion about

23   conversion of the TI loan to a long-term loan in the May

24   18th, 2011 meeting?

25       A.    I don't recall specifically discussing that



Case 2:12-cv-00221-ABJ   Document 33-7   Filed 10/10/13   Page 25 of 42

JOHN SCHNEIDER, M.D.  Non-Confidential                    August 13, 2013
WELLS FARGO vs. NORTHERN ROCKIES                                      27

1   topic.

2        Q.    Do you recall where the May 18th, 2011 meeting

3   took place?

4        A.    Cody, Wyoming, Wells Fargo Bank.

5        Q.    I'm going to ask you about the next day, which

6   is May 19th, 2011.  Do you recall who was in attendance

7   at that meeting?

8        A.    I recall Mr. Ross.  I do not recall his -- if

9   any of his subordinates were there.

10       Q.    Was anyone else there on behalf of NRNS besides

11  you?

12       A.    No.

13       Q.    Did Mr. Ross discuss converting the TI loan to

14  a long-term loan at the May 19th, 2011 meeting?

15       A.    I don't recall the specific conversation;

16  though, Mr. Ross had the concept of overall project and

17  my specific economic needs, and the -- there was

18  conversation relative to what my long-term loan repayment

19  requirements would be relative to other business ventures

20  that I had that Wells Fargo was interested.

21       Q.    So do I understand that to mean you talked

22  about sort of your financial condition overall at this

23  May 19th meeting?

24       A.    Relative to what my anticipated costs would be

25  for this and other projects.



Case 2:12-cv-00221-ABJ   Document 33-7   Filed 10/10/13   Page 26 of 42

JOHN SCHNEIDER, M.D. Non-Confidential                    August 13, 2013
WELLS FARGO vs. NORTHERN ROCKIES                                      28

1      Q.     Okay.  But there was no specific discussion

2   about converting the TI loan to a long-term loan?

3      A.     It was intrinsically assumed that that would

4   occur based upon Mr. Ross's previous representations.

5      Q.     Now the TI loan closed -- well, the note's

6   dated May 23rd, 2011, so when I use that as the closing

7   date, that's what I mean.  Do you recall whether you

8   appeared at Wells Fargo Bank in person to deliver the

9   documents?

10      A.     I believe that the documents were there, and I

11   came into Wells Fargo to sign the documents.

12      Q.     So once the documents were signed, can you tell

13   us sort of in summary fashion how loan advances were made

14   on the TI loan.

15      A.     Well, Mr. Ross -- the length of the building

16   project took longer than had been represented by the

17   builder and developer.

18      Q.     Can I stop for a second.

19      A.     Sure.

20      Q.     Just to clarify that, is the building project

21   the OMNI project itself and not the TI loan, not the

22   tenant improvements?

23      A.     Well, the economic draw was simultaneous.  So

24   the project was being developed, and at a certain point

25   in time -- perhaps it was six months in the project --



Case 2:12-cv-00221-ABJ   Document 33-7   Filed 10/10/13   Page 27 of 42

JOHN SCHNEIDER, M.D.  Non-Confidential                    August 13, 2013
WELLS FARGO vs. NORTHERN ROCKIES                                        30

1    actually deferred that to Liz Romine and Mr. Ross, who

2    had indicated, I believe, that there was a -- they had an

3    inspector, that the bank had an inspector that would go

4    in and make sure that work -- I don't know who that was

5    but make sure the work was done as the building and

6    specifically my tenant improvements matured during the

7    project development.

8        Q.    So on the TI loan, were loan advances made as

9    certain phases of the tenant improvement was completed?

10       A.    I believe so, yes.

11       Q.    Did Wells Fargo make all the loan advances that

12   were necessary, requested by NRNS to complete the tenant

13   improvement?

14       A.    Yes.

15       Q.    Do you know when the tenant improvements for

16   NRNS were completed approximately?

17       A.    I believe we moved in from our other location

18   in Billings in October -- I think it was September,

19   perhaps mid-September of 2011.

20       Q.    So how long -- so if this note is dated May

21   23rd of 2011, did it only take three or four months to

22   complete the tenant improvements?

23       A.    That would be -- I guess that would be

24   accurate.

25       Q.    Wells Fargo advised you in May of 2012 it would



Case 2:12-cv-00221-ABJ   Document 33-7   Filed 10/10/13   Page 28 of 42

JOHN SCHNEIDER, M.D.  Non-Confidential                    August 13, 2013
WELLS FARGO vs. NORTHERN ROCKIES                                        33

1          (Discussion off the record.)

2              MR. BELCHER:  Back on the record.

3      Q.    (BY MR. BELCHER)  Dr. Schneider, I'd like to

4  ask you some questions about Dr. Jimmie Biles.  Who is

5  Dr. Biles?

6      A.    On advice of Counsel, I'm invoking my Fifth

7  Amendment of the United States and decline to answer.

8      Q.    Let me just clarify that for simplicity.  If I

9  ask you any questions about Dr. Biles or payments that

10 were made to Dr. Biles to settle a lawsuit, will I be

11 receiving the same response from you that you will not

12 answer because you're invoking your Fifth Amendment

13 rights?

14     A.    I will.

15     Q.    Okay.

16              (Deposition Exhibit 8 marked for

17               identification.)

18     Q.    (BY MR. BELCHER)  Dr. Schneider, I've handed

19 you or the court reporter has handed you an exhibit that

20 consists of published materials from newspapers regarding

21 various allegations.  I'm going to ask you to take a

22 minute to look at that.

23     A.    I've looked at it.

24     Q.    The first reported document at the top is dated

25 February 1st of 2012, and my reading of this is that the



Case 2:12-cv-00221-ABJ   Document 33-7   Filed 10/10/13   Page 29 of 42

JOHN SCHNEIDER, M.D.  Non-Confidential                    August 13, 2013
WELLS FARGO vs. NORTHERN ROCKIES                                      34

1   Wyoming Board of Medicine temporarily suspended your

2   license, and I'm just going to ask you a few questions

3   about that.  Did you have your license suspended in the

4   first part of 2012?

5       A.    I did.

6       Q.    And how long -- were you prevented from

7   performing surgery as a rule of that suspension?

8       A.    I was.

9       Q.    And how long did that keep you from performing

10  surgery?

11      A.    Five weeks.

12      Q.    Did that have a financial effect on NRNS?

13      A.    It did.

14      Q.    What was the effect of that?

15      A.    Decreased revenue from the -- that five-week

16  period.

17      Q.    Do you know how much revenue NRNS lost as a

18  result of your license being suspended for that five-week

19  period?

20      A.    I believe we answered that in an interrogatory,

21  and I'd like to refer to that interrogatory.

22      Q.    That's fine.

23            MR. CLARK:  I'm not seeing the specific

24  one, John.

25            THE DEPONENT:  Perhaps it was an answer

Case 2:12-cv-00221-ABJ   Document 33-7   Filed 10/10/13   Page 30 of 42

JOHN SCHNEIDER, M.D.  Non-Confidential                    August 13, 2013
WELLS FARGO vs. NORTHERN ROCKIES                                        35

1   to production.

2       A.    I believe we calculated that at 160,000 in one

3   of the answers to one of the interrogatories, but --

4                   MR. BELCHER:  Look at interrogatory

5   number 26.  This is NRNS.

6                   MR. CLARK:  Oh, yeah.  There you go.  I

7   knew it was there, I just couldn't find it.

8       A.    The calculated loss is $168,900.

9       Q.    (BY MR. BELCHER)  Do you know how that loss was

10  calculated?

11      A.    I do.  The projection -- since my surgical

12  bookings are six to eight weeks out, I had people on the

13  OR schedule when that -- and my OR schedule was booked

14  for the month of January and most of February or all of

15  February, I believe, when the suspension -- when I was

16  notified of the suspension on a Saturday night.  And so

17  we could calculate what the anticipated net revenue would

18  have been from those surgical procedures based upon

19  historical performance.

20      Q.    So about a little over $30,000 a week; is that

21  correct?

22      A.    That would be correct.

23      Q.    Okay.  And after the suspension, your license

24  to practice in Wyoming was reinstated, right?

25      A.    Correct.



Case 2:12-cv-00221-ABJ   Document 33-7   Filed 10/10/13   Page 31 of 42

JOHN SCHNEIDER, M.D.  Non-Confidential                    August 13, 2013
WELLS FARGO vs. NORTHERN ROCKIES                                        43

1

2

3

4

5

6

7      Q.    Let me go back to Exhibit 8, and it's the last

8   two pages.  And this appears to be a report of a lawsuit

9   filed by the estate of Russell Monaco that was just

10  recently filed.  Are you aware of this lawsuit?

11     A.    I have not been served on this lawsuit.

12     Q.    This makes reference to his -- the death of

13  Russell Monaco in late 2011.  Is his death related to the

14  matter that resulted in the temporary suspension of your

15  license by the Wyoming medical authorities?

16     A.    Yes.

17     Q.    Okay.  At the time that your license was

18  suspended, had the family of Russell Monaco made any

19  claims against you?

20     A.    No.

21     Q.    I'm going to ask you to explain the damages

22  that Northern Rockies Neuro-Spine claims it suffered as a

23  result of Wells Fargo Bank refusal to convert the TI loan

24  to a long-term loan.  Can you explain the time period in

25  which the damages occurred.



Case 2:12-cv-00221-ABJ   Document 33-7   Filed 10/10/13   Page 32 of 42

JOHN SCHNEIDER, M.D. Non-Confidential                    August 13, 2013
WELLS FARGO vs. NORTHERN ROCKIES                                      44

1    A.    Well, based upon the economic projections of

2    Northern Rockies Neuro-Spine with a full staff --

3    including midlevels, highly compensated personnel, and

4    other employed physicians -- the economic projections of

5    Northern Rockies Neuro-Spine to meet its monthly debts

6    had been calculated.  That calculation was based upon an

7    anticipation that the TI, the outstanding principal

8    amount for the TI loan would be converted into a 15-year

9    note.  When that didn't occur, it became necessary to

10   look at the tactical daily operations of Northern Rockies

11   Neuro-Spine to be able to meet the debt, the monthly debt

12   of running that operation.  So it was necessary to

13   terminate key individuals that were an integral part of

14   the ability to run that organization anticipating that I

15   would need to amass moneys to try to meet an obligation

16   that I clearly wasn't expecting.

17   Q.    So how much did you calculate the monthly

18   payment would be on the TI loan?

19   A.    I don't recall the specific calculation.  We

20   anticipated the principal amount with a reasonable five

21   percent interest rate over 15 years, I believe.  At the

22   time that was the calculation that I was anticipating in

23   my conversations with Mr. Ross at the end of 2011.

24   Q.    Do you know the principal amount that you used?

25   A.    The -- I believe it was $550,000.



1    Q.    And as I understand it, your claim is that

2   Wells Fargo's unwillingness to convert this to a

3   long-term loan caused 25 percent of the loss of revenues

4   by Northern Rockies Neuro-Spine; is that correct?

5    A.    That's correct.

6    Q.    And the total amount of lost revenues is

7   $2,326,018.67; is that correct?

8    A.    Correct.

9    Q.    Where did that number come from?

10    A.    We looked at the profit and loss statements of

11   2010, 2011, 2012.

12    Q.    And what -- when you say "we," who worked with

13   you in coming up with this information?

14    A.    My representative attorney and -- well, my

15   representative attorney.

16    Q.    And so tell me what factor you arrived at to

17   come up with $2,326,018.67.

18    A.    Well, that was -- I do not believe that's the

19   claim -- our claim against Wells Fargo is 25 percent of

20   that number, not that entire number.

21    Q.    Right.

22    A.    And that's based upon the diminished revenues

23   which can be directly related to the need to constrict

24   access to my practice based upon the termination of

25   employed physicians under Northern Rockies Neuro-Spine as



Case 2:12-cv-00221-ABJ   Document 33-7   Filed 10/10/13   Page 34 of 42

JOHN SCHNEIDER, M.D.  Non-Confidential                    August 13, 2013
WELLS FARGO vs. NORTHERN ROCKIES                          46

 1  well as employed midlevels -- putting a physician

 2  assistant and nurse practitioner -- that occurred as a

 3  result of the constriction of the practice and the

 4  practice expenses in an attempt to meet the debt that

 5  Mr. Ross thrust upon me over a very short period of time.

 6      Q.    I understand that apparently there were lost

 7  revenues because people that could perform services were

 8  not employed; is that correct?

 9      A.    Correct.

10      Q.    I'm trying to arrive at -- you said that you

11  looked at 2010, 2011, and 2012 revenue figures?

12      A.    Correct.

13      Q.    And I'm trying to determine how those came into

14  play.

15      A.    Well, I have the impact of failure to convert

16  the TI loan to a long-term loan and the requested

17  repayment or the demand for repayment of $550,000, more

18  or less, from Wells Fargo.  That became a line item

19  expense from Northern Rockies Neuro-Spine, and so to

20  attempt to -- I don't keep $550,000 in my accounts

21  receivable to be pulled off in a moment's notice.  So

22  anticipating the need to collect that amount of money was

23  necessary to terminate physicians, midlevels, who would

24  generate income during that timeframe.  So I can look at

25  the -- I can look at the profit and loss statement from



Case 2:12-cv-00221-ABJ   Document 33-7   Filed 10/10/13   Page 35 of 42

JOHN SCHNEIDER, M.D.  Non-Confidential                    August 13, 2013
WELLS FARGO vs. NORTHERN ROCKIES                                      47

```
 1   2012 when I had lost these individuals who were revenue
 2   generating sources for Northern Rockies Neuro-Spine and
 3   compare that to 2011.  The reduction of net revenues --
 4   excuse me, the reduction of gross revenues is the
 5   denominator -- the -- excuse me, the numerator.  The
 6   denominator is the impact that those individuals who were
 7   revenue generators who are no longer a part of my
 8   practice as a direct result of me needing to constrict
 9   the practice to meet the debt obligation, and that
10   includes one individual who is not a revenue generator,
11   Theresa Trier who was the operational manager for
12   Northern Rockies Neuro-Spine who took a 75 percent pay
13   cut for four months and decided that she had better
14   opportunities elsewhere and left.  So the infrastructure
15   of management as well as other providers during that
16   timeframe created a diminishing revenues that we
17   calculated at 25 percent of the overall decline in gross
18   revenues.
19        Q.    So who were the revenue generators that did not
20   generate revenues under your damages calculation?
21        A.    I had physician assistant Harley Morrell.  I
22   had nurse practitioner Bob Gantz, G-A-N-T-Z.  I had
23   employed an internal medicine physician, I'm actually
24   blanking her name, all of which were generating revenues
25   for Northern Rockies Neuro-Spine outside of John H.
```



Case 2:12-cv-00221-ABJ  Document 33-7  Filed 10/10/13  Page 36 of 42

JOHN SCHNEIDER, M.D.  Non-Confidential                    August 13, 2013
WELLS FARGO vs. NORTHERN ROCKIES                                    48

 1  Schneider, M.D.  I was the other revenue generator.

 2      Q.    So they would have generated revenues for

 3  Northern Rockies Neuro-Spine, and after paying whatever

 4  compensation they were entitled to, there'd be lost

 5  profits; is that correct?

 6      A.    Correct, but they were terminated.

 7      Q.    Right.  But as a result of -- so I'm trying to

 8  arrive at this $2,326,000 figure.  Is that lost profit?

 9  That's the 100 percent lost revenues.

10      A.    Right.

11      Q.    Is that lost profit?

12      A.    That's lost gross.

13      Q.    Okay.  So that's before deducting any costs

14  attributable to these revenue providers?

15      A.    Correct.

16      Q.    That had left, correct?

17      A.    Correct.

18      Q.    So what percentage of that $2,326,000 figure

19  would be profit that NRNS lost?

20      A.    Well, our overhead was -- I mean, the

21  historical overhead for the practice is the only way I

22  can answer that, and it ran between 32, 33 percent.

23      Q.    But you agree, don't you, as a result of these

24  revenue producers not being employed NRNS also saved

25  expenses, correct?



Case 2:12-cv-00221-ABJ   Document 33-7   Filed 10/10/13   Page 37 of 42

JOHN SCHNEIDER, M.D.  Non-Confidential                    August 13, 2013
WELLS FARGO vs. NORTHERN ROCKIES                                       49

1        A.      Correct.

2        Q.      Now, my understanding is you attribute 25

3    percent of that loss to Wells Fargo's refusal to convert

4    the TI loan to a long-term loan.  How did you arrive at

5    that 25 percent figure?

6        A.      The figure was based upon the impact of

7    terminating revenue generators and the attrition of key

8    critical management personnel for the strategic

9    operations of Northern Rockies Neuro-Spine, and so 75

10   percent of the loss is not related to Wells Fargo failure

11   to convert the TI loan.  And we estimated 25 percent is.

12       Q.      So help me understand the 75 percent.  What

13   contributed to the 75 percent loss from other factors?

14       A.      Well, the loss of key personnel and the loss of

15   a strategic business manager was not -- has an impact on

16   the overall practice beyond just the economics of the

17   Wells Fargo note, not being able to generate income at

18   the OMNI center because the surgery center failed to

19   open.  That's a significant loss of revenues anticipated

20   for Northern Rockies Neuro-Spine.  The 25 percent decline

21   in the overall practice as I previously -- 23 percent

22   decline in the overall practice I had previously noted

23   had that impact on that $2,000,000 as well.

24       Q.      So there were other factors besides Wells

25   Fargo's unwillingness to convert this to a long-term loan



Case 2:12-cv-00221-ABJ  Document 33-7  Filed 10/10/13  Page 38 of 42

JOHN SCHNEIDER, M.D.  Non-Confidential                August 13, 2013
WELLS FARGO vs. NORTHERN ROCKIES                              50

1    that contributed to lost revenues to Northern Rockies

2    Neuro-Spine; is that correct?

3        A.    For which we've ascribed 75 percent of the lost

4    revenues to those other factors.

5        Q.    Right.  I want you to -- I want to ask about

6    what are the details behind that 75 percent.  What goes

7    into the 75 percent?

8        A.    Well, the revenue generated by the individuals

9    that are no longer with the practice, the strategic

10   manager of the practice with key personnel, that goes

11   into the 75 percent.  The lack of the surgery center

12   opening, as I indicated, the 20 to 30 percent drop in

13   revenues relative to bad press, that goes into the

14   overall number and is apportioned based upon our

15   guesstimation of the impact of those specific economic

16   demands or events on the bottom line.

17       Q.    You mentioned looking at revenues for Northern

18   Rockies Neuro-Spine for years 2010, 2011, and 2012 in

19   arriving at this; is that correct?

20       A.    Correct.

21       Q.    What were the revenues of Northern Rockies

22   Neuro-Spine in 2010?

23       A.    5,000,000-some-odd dollars.

24       Q.    Do you recall what they were in 2011?

25       A.    I believe it was somewhere between four and a



Case 2:12-cv-00221-ABJ   Document 33-7   Filed 10/10/13   Page 39 of 42

JOHN SCHNEIDER, M.D.  Non-Confidential                    August 13, 2013
WELLS FARGO vs. NORTHERN ROCKIES                                      51

```
 1    half and 5,000,000.

 2        Q.    And how about 2012?

 3        A.    Just under 3,000,000 gross.  These are gross

 4    numbers.

 5        Q.    Right.  What steps did Northern Rockies

 6    Neuro-Spine take to attempt to borrow money elsewhere to

 7    pay off Wells Fargo Bank?

 8        A.    I talked with previous lender Western Security

 9    who holds the note for the TI improvements on the surgery

10    center, and they weren't interested in lending any money

11    that had to do with the OMNI center project.

12        Q.    Did you check with anyone else?

13        A.    I did not.

14        Q.    Now, Northern Rockies Neuro-Spine never made

15    any payments on the TI loan after it received the May

16    2012 letter; isn't that correct?

17        A.    I believe that's correct.

18        Q.    Wells Fargo Bank never applied any of the

19    accounts receivable that secured that loan to reduce the

20    loan; isn't that correct?

21        A.    I believe that's correct.

22        Q.    So Northern Rockies Neuro-Spine had the

23    availability of all of the accounts receivable since May

24    of 2012, correct?

25        A.    That's -- Northern Rockies Neuro-Spine has
```



Case 2:12-cv-00221-ABJ   Document 33-7   Filed 10/10/13   Page 40 of 42

JOHN SCHNEIDER, M.D.  Non-Confidential                August 13, 2013
WELLS FARGO vs. NORTHERN ROCKIES                                    52

 1   other debt obligations, but, yes, that's correct.

 2        Q.    But it's had Wells Fargo's collateral to use

 3   for its business operations, correct?

 4        A.    Correct.

 5        Q.    Wells Fargo's never notified anybody that owed

 6   money to Northern Rockies Neuro-Spine to send money to

 7   Wells Fargo, correct?

 8        A.    Not to my knowledge.

 9        Q.    To your knowledge they have not -- Wells Fargo

10   has not asked anyone to remit payment to Wells Fargo,

11   correct?

12        A.    Other than Northern Rockies Neuro-Spine?

13        Q.    Right.

14        A.    Correct.

15                     (Deposition Exhibit 9 marked for

16                      identification.)

17        Q.    (BY MR. BELCHER)  Dr. Schneider, I've handed

18   you what's labeled or asked the court reporter to hand

19   you what's labeled Exhibit 9.  I'm going to ask you to

20   take a minute to look at that, if you would, please.

21        A.    I've looked at it.

22        Q.    Do you recall sending this e-mail to Glenn

23   Ross?

24        A.    I do.

25        Q.    Now, my understanding is that you were asking



Case 2:12-cv-00221-ABJ  Document 33-7  Filed 10/10/13  Page 41 of 42

JOHN SCHNEIDER, M.D.  Non-Confidential                    August 13, 2013
WELLS FARGO vs. NORTHERN ROCKIES                                      53

1   Wells Fargo to loan Northern Rockies Neuro-Spine

2   $3,000,000 to be paid out over seven years; is that a

3   correct understanding?

4       A.    Correct.

5       Q.    And as I understand it, you were offering to

6   secure that loan with $3,000,000 of deposits owned by

7   Northern Rockies Insurance; is that also correct?

8       A.    Correct.

9       Q.    I'm going to ask you to explain what you meant

10  by, to meet credentialing criteria you cannot show that

11  the 3,000,000 is assigned elsewhere.  What does that

12  mean?

13      A.    Well, at the time I was credentialed at West

14  Park Hospital in Cody, Wyoming, and West Park Hospital is

15  part of their credentialing required insurance as they do

16  of every physician, insurance verification.  Northern

17  Rockies Insurance Company was not allowed to have a lien

18  placed on it by any debtor in order to maintain my

19  credentials at West Park Hospital.  So if I were to use

20  Northern Rockies Insurance Company moneys to

21  collateralize a debt, then there could not be a lien on

22  that debt or else my credentials -- I would have to

23  report that, and I couldn't be credentialed at that

24  institution.  So not being a banker, it's in this -- and

25  this e-mail came after lengthy conversations with

1 | Mr. Ross about us trying to increase my economic position

2 | for retirement investment at the time.  So the -- if I

3 | were to sign for this debt, I would have -- I could show

4 | that it was collateralized by Northern Rockies Insurance

5 | Company money, but I could not have a lien placed upon

6 | that.  So that's what I was looking to.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

