James R. Belcher
Wyoming Bar # 5-2556
Crowley Fleck PLLP
237 Storey Boulevard, Ste. 110
Cheyenne, WY 82009
(307) 426-4105
(307) 426-4099 (FAX)
Attorneys for Wells Fargo Bank, N.A.

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| WELLS FARGO BANK. N.A.,<br> a national bank, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 12-CV-221-J |
| NORTHERN ROCKIES NEURO-<br>SPINE, P.C., a Wyoming corporation,<br>JOHN H. SCHNEIDER, MICHELLE<br>SCHNEIDER, SCHNEIDER LIMITED<br>PARTNERSHIP, a Wyoming limited<br>partnership, JOHN SCHNEIDER<br>REVOCABLE TRUST U/A/D<br>NOVEMBER 20, 2007, MICHELLE<br>SCHNEIDER REVOCABLE TRUST<br>U/A/D NOVEMBER 20, 2007,<br>SCHNEIDER MANAGEMENT, LLC,<br>a Wyoming limited liability company, | ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

# WELLS FARGO BANK'S MEMORANDUM BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Wells Fargo submits this Memorandum Brief in support of its Motion for Summary Judgment on its Complaint and on the Defendants' Counterclaims.

## INTRODUCTION AND NATURE OF CLAIMS

Wells Fargo Bank, N.A. ("Wells Fargo") made a loan (the "TI Loan") to Northern Rockies Neuro-Spine, P.C. ("NRNS") to fund construction costs for tenant improvements in an office suite in a new surgery center-office complex. The loan is evidenced by a promissory note dated May 23, 2011 which has a June 15, 2012 maturity date. Dr. John Schneider, his wife Michelle Schneider, two of their trusts and two other entities they own guaranteed payment of the TI Loan.

Wells Fargo was processing NRNS's request to convert the TI Loan to a long-term loan when newspaper articles reported that attorneys for Dr. and Mrs. Schneider asked to withdraw from a lawsuit filed by Dr. Jimmie Biles. According to the newspaper articles, the attorneys asked to withdraw because the Schneiders were accused of improperly instructing a witness in the Biles case to lie in exchange for a large financial reward and Dr. Schneider was accused of providing the witness a medical excuse to avoid appearing at a deposition. During this time, Dr. Schneider instructed Wells Fargo to withdraw $2,500,000 from his account and the Biles case was promptly settled. The Schneiders failed to advise Wells Fargo of any of this. Wells Fargo concluded that the publicity negatively affected Dr. Schneider, his medical practice and NRNS's ability to pay the TI Loan. Consequently, Wells Fargo decided

not to convert the TI Loan to a long-term loan and demanded payment from NRNS and the TI Loan guarantors.  When asked in depositions in the case at bar to disclose the payment made to settle the Biles case, the Schneiders refused to answer by asserting their Fifth Amendment rights against self incrimination.

When payment was not remitted, Wells Fargo filed suit.  In response, NRNS and the guarantors alleged that Wells Fargo's banking officer had promised to convert the TI Loan to a long-term loan at the TI maturity.  Based on that allegation and Wells Fargo's refusal to convert the TI Loan to a long-term loan, NRNS and the guarantors assert six counterclaims against Wells Fargo for i) breach of an oral contract, ii) breach of the implied covenant of good faith and fair dealing, iii) promissory estoppel, iv) equitable estoppel, v) negligent misrepresentation, and vi) fraud in the inducement.

There is no dispute that Wells Fargo made the loan advances for which payment was demanded.  There are also no other genuine issues of material fact regarding the counterclaims against Wells Fargo.  Accordingly, Wells Fargo requests that the Court enter summary judgment in its favor.

## **MATERIAL FACTS**

The material facts regarding Wells Fargo's claims and NRNS and the TI Loan guarantors' counterclaims are set forth below.  The facts are supported by the Affidavit of Wells Fargo's Business Banking Manager-Market President, Glenn Ross, exhibits to his Affidavit, other exhibits submitted by Wells Fargo in support of its Motion for

Summary Judgment and portions of deposition transcripts of Dr. and Mrs. Schneider. To avoid the creation of a genuine issue of material fact, Wells Fargo has relied on the sworn testimony of Dr. Schneider as to the alleged promise by Wells Fargo to convert the TI Loan to a long-term loan.  Wells Fargo has not disputed his testimony only for purposes of this summary judgment motion.

**Initial Banking Relationship**

The banking relationship between Dr. John Schneider, Northern Rockies Neuro-spine P.C. ("NRNS") and Wells Fargo Bank, N.A. ("Wells Fargo") dates back to 2005-2006.  At that time, Dr. Schneider and NRNS established deposit account relationships with Shoshone First Bank in Cody, Wyoming.[1] [Deposition of John H. Schneider ("Schneider Depo") @ 4:5-16].  Dr. Schneider also obtained personal loans for real estate purchases and development. [Schneider Depo @ 4:17-22].  Glenn Ross was the primary banker for Dr. Schneider. [Schneider Depo @ 5:1-7].

**The OMNI Project Financing**

Dr. Schneider and other doctors became interested in constructing and developing a surgery center and physician office complex in Billings, Montana (the "OMNI Project"). [Schneider Depo @ 7:8-15].  In early 2009, Dr. Schneider began discussing with Mr. Ross the possibility of Wells Fargo financing the OMNI Project. [Schneider Depo @ 10:6-11:11].  After equity capital had been raised for the OMNI

---

[1] Wells Fargo became successor by consolidation with Shoshone First Bank in 2008.

4

Project, the investors created architectural drawings and construction estimates. [Schneider Depo @ 12:13-25]. This process took over one year, at which time Wells Fargo agreed to make a $3,750,000.00 loan for the OMNI Project as evidenced by a Promissory Note dated October 28, 2010 (the "OMNI Project Note"). [Schneider Depo @ 13:14-21; WFB MSJ Exhibit D]. The OMNI Project Note requires monthly payments of interest only from the Note date until the May 15, 2012 Conversion Date. At that time, the loan automatically converted from a construction loan to a long-term loan, requiring monthly payments to fully amortize the unpaid loan balance over a 20 year term. [WFB MSJ Ex. D "Payment Schedule"].

**The TI Loan Discussions**

Dr. Schneider recalls discussing with Mr. Ross in late 2009 or early 2010 a loan to NRNS to be used to pay the cost of tenant improvements for NRNS's office suite in the OMNI Project (the "TI Loan"). [Schneider Depo @ 16:2-17:17]. Dr. Schneider did not know how much money NRNS needed to borrow but asked at that time that the loan be a long-term loan. [Schneider Depo @ 18:20-19:8; Affidavit of Glenn Ross ("Ross Aff") @ ¶ 14]. Glenn Ross is the only Wells Fargo representative who allegedly promised to convert the TI Loan to a long-term loan. Dr. Schneider testified that Mr. Ross stated at the initial meeting in late 2009 or early 2010 that the TI Loan would be written for a one-year term during which the tenant improvements were constructed. At maturity, the TI Loan would be converted to a long-term loan (the "Conversion

Promise").  The amount and term of the long-term loan were never stated. [Schneider Depo @ 20:6-22:12].  No further discussions regarding converting the TI loan to a long-term loan at the Note maturity ever took place. [Schneider Depo @ 22:23-23:18]. Rather, Dr. Ross merely assumed the TI loan would be converted to a long-term at the TI Note maturity. [Schneider Depo @ 23:18-24:3; 26:14-28:4].

It was not uncommon to convert a loan like the TI Loan to a long-term loan once construction was complete.  At the time Dr. Schneider requested a long-term loan Wells Fargo believed that doing so was one of the repayment options when the TI Loan matured. [Ross Aff @ ¶ 14; Depo Exhibit 14].

**TI Loan Approval**

Dr. Schneider did not obtain a final estimate for the cost of the tenant improvements until April of 2011 [WFB MSJ Exhibit E], and in May of 2011 advised Wells Fargo that NRNS needed as much as $850,000.00 for the TI Loan. [WFB MSJ Exhibit F].  Wells Fargo then approved the TI Loan for that amount.  Wells Fargo's records indicate that the TI Loan would be paid at TI Note maturity from several possible sources: i) restructured into a term loan, ii) conversion of NRNS's accounts receivable to cash, or iii) by the TI Loan Guarantors.  [Depo Exhibit 14, p. 3 "Purpose of Request (Use of Proceeds)", p. 4 "Repayment Sources"].

**TI Loan Documents**

Dr. Schneider signed a Promissory Note dated May 23, 2011 ("TI Note") on behalf of NRNS that sets forth the payment terms of the TI Loan.  Unlike the OMNI Note, the TI Note required payment in full on June 12, 2012.  [Depo Exhibit 3, pg. 1 "Payment"].  It contains no provision to convert the TI Loan to a long-term loan at the stated maturity date.

Dr. Schneider, his wife Michelle, their Revocable Trusts, Schneider Limited Partnership and Schneider Management, LLC (the "Guarantors") each executed and delivered to Wells Fargo a Commercial Guaranty dated May 23, 2011 ("Guaranty") to personally guarantee payment of the TI Loan. [Depo Exhibits 1, 2, 4, 5; WFB MSJ Exhibits A, B].

Wells Fargo made loan advances on the TI Loan as funds were needed to construct tenant improvements. [Schneider Depo @ 30:8-24; Ross Aff @ ¶ 18].

**NRNS Subsequent Loan Requests to Make the TI Loan a Long-Term Loan**

After the TI Loan Note was signed and loan funds advanced, Dr. Schneider asked Wells Fargo for a number of additional loans, some of which included restructuring or combining the TI Loan balance with other loans.  In September 2011, shortly after the TI Loan documents were signed, Dr. Schneider asked Wells Fargo to make a $5,000,000 long-term loan to NRNS, part of which would be used to repay the TI Loan. [WFB MSJ Exhibit G].  Dr. Schneider became impatient when Wells Fargo had not approved this

loan request, stating: "It is apparent that the complex nature of my personal and professional business and structures…is too foreign for local financial institutions." [WFB MSJ Exhibit H].  On December 3, 2011, Wells Fargo approved the $5,000,000 loan request, but Dr. Schneider abandoned this loan request when he was sued by Dr. Jimmie Biles. [WFB MSJ Exhibit I].

In March 2012, Dr. Schneider asked Wells Fargo to make another loan to NRNS, with the loan proceeds to be used to pay the TI Loan and to pay NRNS's lease payments for its office suite in the OMNI Project, payable over a 24 month term. [Depo Exhibit 15].  Dr. Schneider then changed this request, asking for a 36 month repayment term. [WFB MSJ Exhibit J].

Several weeks later, Dr. Schneider again changed this loan request. He asked Wells Fargo to loan NRNS $3,000,000 to be secured by bank deposits owned by Northern Rockies Insurance Group, not by deposits owned by NRNS.  He stated that Northern Rockies Insurance Group was prohibited from granting a lien against the deposits. [Schneider Depo @ 53:9-24].  Consequently, he asked Wells Fargo to conceal the assignment of those deposits as collateral for the NRNS loan. [Depo Exhibit 9]. Wells Fargo never funded any of the requested loans to NRNS other than the original TI Loan.  [Ross Aff @ ¶ 19.d.].

**Wells Fargo's Efforts to Convert the TI Loan to a Long-Term Loan**

Wells Fargo began the process of converting the TI Loan to a long-term loan in the spring of 2012, before it matured on June 15, 2012.  Wells Fargo requested current financial information from NRNS and the TI Loan guarantors.  At that time, Dr. Schneider asked Wells Fargo to convert the TI Loan to a five year, fixed rate loan. [Depo Exhibit 16].  Due to difficulties the Schneiders faced and NRNS's deteriorating financial conditions (as explained below), Wells Fargo discontinued efforts to convert the TI Loan to a long-term loan and, instead, asked NRNS to make arrangements to pay the TI Loan in full at maturity. [Ross Aff @ ¶ 22; Depo Exhibit 6].

**The Schneiders and NRNS's Problems, Negative Publicity and Diminished Financial Condition**

After the TI Loan was funded but before the TI Note matured, Dr. Schneider and NRNS were publicly subjected to claims of improperly prescribing medication, malpractice and disparagement of another doctor.  Dr. Schneider was accused of improperly prescribing pain medicine for a patient on whom he had performed surgery. This resulted in an investigation by the Wyoming Board of Medicine.  His license to practice medicine in Wyoming was suspended for five weeks in early 2012 and NRNS lost revenues totaling $168,900 as a result of that suspension. [Schneider Depo @ 33:16-35:22].

At about the same time the alleged improper prescription of pain medicine took place, Dr. Schneider was sued by Dr. Jimmie Biles.  [Depo Exhibit 8, pg. 2].  When

9

Wells Fargo learned of that lawsuit, it was not aware of the facts that later surfaced in May 2012 when Dr. Schneider's attorneys asked Chief United States District Court Judge Nancy Freudenthal to allow them to withdraw from representing Dr. Schneider in the Biles lawsuit. [Ross Aff @ ¶ 21].

According to newspaper articles published May 7, 14, 15 and 16, 2012, Dr. and Mrs. Schneider were accused of improperly instructing a witness in the Biles case to lie in exchange for a handsome payment.  Dr. Schneider was also accused of providing the witness with a note for the witness's personal doctor to sign to excuse her from answering deposition questions.  During this time, Dr. Schneider instructed Wells Fargo to withdraw $2,500,000 from accounts he controlled without telling Wells Fargo the purpose of doing so.  [Ross Aff @ ¶ 21, WFB MSJ Exhibit K].  Dr. Schneider never advised Wells Fargo of the allegations brought to the court's attention by his lawyers as reported by newspapers published in the area in which Dr. Schneider practiced.  Wells Fargo surmised that the Schneiders had paid the $2,500,000 to settle the Biles lawsuit and was concerned how the negative publicity would affect Dr. Schneider, his medical practice and NRNS's ability to pay the TI Loan.  Consequently, Wells Fargo decided not to convert the TI Loan to a long-term loan and demanded payment from NRNS and the TI Loan guarantors. [Ross Aff @ ¶ 22; Depo Exhibit 6].

**Schneiders' Refusal to Answer Questions Regarding the Biles Lawsuit and Settlement**

Dr. and Mrs. Schneider were asked in their depositions about the Biles lawsuit and how much had been paid to settle that lawsuit.  The purpose of these questions was to determine whether Wells Fargo's suspicion that the financial well-being of NRNS and the Schneiders had in fact deteriorated.  Despite a court order requiring the Schneiders to answer questions regarding settlements [Docket # 30], the Schneiders refused to answer any questions about the Biles settlement by invoking their Fifth Amendment right to remain silent.  [Schneider Depo @ 33:3-14; Deposition of Michelle Schneider ("Mrs. Schneider Depo") @ 12:6-22].

**Wells Fargo Never Made Any Representations to Mrs. Schneider regarding a Long-Term Loan**

Michelle Schneider and her Revocable Trust are guarantors of the TI Loan. She acknowledges that no Wells Fargo representative ever represented to her that the TI Loan would be converted to a long-term loan at the TI Note maturity. [Mrs. Schneider Depo @ 10:22-12:1].

**Unpaid TI Loan Balance**

Wells Fargo made loan advances to NRNS totaling $559,486.96 to pay for tenant improvements in the OMNI Project.  [WFB MSJ Exhibit C].  No principal payments have been paid on the loan.  As of October 9, 2013, the unpaid balance owing on the TI

Loan is as follows:

| | |
|---|---|
| Principal | $559,486.96 |
| Interest | $58,994.79 |
| Total | $618,481.75 |

Interest accrues at the annual rate of 8.50% ($132.10/day) on the unpaid TI Loan balance. [Ross Aff @ ¶ 11].

**Damages**

The Guarantors and NRNS assert that Wells Fargo's refusal to convert the TI Loan to a long- term loan at maturity caused NRNS to suffer damages in the amount of $581,504.67. [Answer to Wells Fargo Bank's First Interrogation].   This figure represents 25% of $2,326,018.67 in gross revenues NRNS calculates it lost in calendar year 2012 as compared to 2011 and 2010. [Schneider Depo @ 43:21-47:18].   The damages allegedly resulted from lost revenues NRNS projected it would receive from services performed by employees it terminated. [Schneider Depo @ 46:6-9].  In arriving at its damages claim, NRNS did not deduct the costs or expenses it saved by terminating the employees. [Schneider Depo @ 48:2-17].

NRNS attributes 75% of the lost revenues to causes other than Wells Fargo's refusal to convert the TI Loan to a long-term loan.  These include the failure of the OMNI Project surgery center to open and the impact of the negative publicity from the newspaper articles published in 2012. [Schneider Depo @ 49:24-50:16].  Dr. Schneider describes the 25% allocation of lost revenues to Wells Fargo as "guestimation." [Schneider Depo @ 50:11-16].

The allocation of 25% of the lost gross revenues to Wells Fargo is based upon loan payments NRNS calculated it would have paid to Wells Fargo if the TI Loan had been converted to a 15 year long-term loan at a 5% interest rate.  Dr. Schneider was "anticipating" these loan terms after his conversations with Glenn Ross "at the end of 2011." [Schneider Depo @ 43:21-45:5].  NRNS never paid any of those calculated loan payments to Wells Fargo nor did it pay to Wells Fargo any of the amounts it collected from accounts receivable pledged as collateral for the TI Loan.  And Wells Fargo never demanded payment from NRNS or any of the account obligors on NRNS's accounts receivable.  Rather, NRNS had full use of all of its accounts receivable collections, which it used to pay debts other than the TI Loan. [Schneider Depo @ 51:14-52:14].

**NRNS Made Little Effort to Obtain Funds to Pay the TI Loan**

NRNS did little to seek funding to pay off Wells Fargo.  It asked only one other lender, Western Security, for a loan to pay off Wells Fargo. Western Security had made tenant improvement loans to other tenants of the OMNI Project but reportedly was not interested in making further loans that had any relationship to the OMNI Project. [Schneider Depo @ 51:5-13].

**Mrs. Schneider's Damages Claim Derives Solely From Her Marriage to Dr. Schneider**

Mrs. Schneider does not claim any damages against Wells Fargo on her own behalf.  Her damages claim results solely from the "trickle down" effect to Mrs. Schneider and her family from damages alleged to have been suffered by Dr. Schneider and his business.  Mrs. Schneider has no ownership interest in NRNS. [Mrs. Schneider Depo @ 12:23-15:1].

### SUMMARY OF ARGUMENT

Wells Fargo entered into the TI Loan transaction with NRNS and the Guarantors and made all loan advances NRNS requested to pay the construction costs for tenant improvements in NRNS's office suite in the OMNI Project.  The parties have a binding contract.  When the Note came due at the unambiguously stated maturity date, Wells Fargo demanded payment.  NRNS and the Guarantors failed to pay the TI Loan balance and Wells Fargo is entitled to judgment against each of them, jointly and severally.

All of the counterclaims of NRNS and the Guarantors are based on the alleged Conversion Promise.  NRNS asserts a fraud in the inducement counterclaim to attempt to invalidate the TI Loan contract.  That fraud counterclaim fails for a number of reasons.  First, the burden of proof is clear and convincing evidence.  NRNS cannot satisfy this standard because the Affidavit of Mr. Ross and supporting Exhibits show that after the TI Note was signed Dr. Schneider made a number of requests to Wells Fargo to convert the TI Loan to a long-term loan with maturities that differ from those

14

he alleges Mr. Ross promised.  Second, NRNS cannot show that Wells Fargo made the Conversion Promise without intending to convert the TI Loan to a long-term loan at maturity.  Just the opposite is true.  Wells Fargo indicated in its loan approval that a long-term loan was one of the repayment sources at TI Note maturity and Wells Fargo began the process of doing so before the TI Note maturity date - until Wells Fargo learned that Dr. and Mrs. Schneider were publicly accused of witness tampering and apparently paid Dr. Jimmie Biles $2,500,000 to settle his lawsuit.  Only then did Wells Fargo decide not to convert the TI Loan to a long-term loan.  Last, the Defendants have no viable damages claim.  The bad publicity from the reports of alleged witness tampering dismantled Dr. Schneider's medical practice and NRNS's financial well-being.  Patient revenues dropped by 50% or more.  They have cobbled together a claim that Wells Fargo's refusal to convert the TI Loan to a long-term loan caused 25% of the decreased revenues.  Their damages claim is illogical because, rather than having suffered a loss, they actually increased the funds available to NRNS which  it used to pay other creditors.  They never made a single payment to Wells Fargo after allegedly budgeting funds to pay the TI Loan.  Further, their damages claim is not supported by evidence of lost profits but is founded on a "guess" and is speculative.

With no viable fraud claim, the TI Loan transaction cannot be set aside as an invalid contract and the Note terms are binding.  The parol evidence rule bars NRNS and the Guarantors from submitting oral evidence that contradicts the TI Note

provisions. Further, their estoppel counterclaims cannot be recognized because a binding TI Note contract is in effect. Similarly, their claim that Wells Fargo breached the covenant of good faith and fair dealing by refusing to convert the TI Loan to a long-term loan lacks legal merit because it would impose a duty on Wells Fargo that contradicts the TI Note contract and because no separate contract for a long-term loan exists.

For the foregoing reasons, Wells Fargo is entitled to summary judgment on its claims against NRNS on the Note and against the Guarantors on their Guarantys, and all counterclaims should be dismissed because they lack legal merit.

## ARGUMENT

### I.    Wells Fargo Is Entitled To Summary Judgment On Its Claim For Money Judgment Against NRNS And The Guarantors Under Unambiguous Loan Documents

The NRNS Note and Guaranty agreements all state they are governed by Wyoming law. The Note unambiguously states that NRNS "will pay this loan in one payment of all outstanding principal plus all accrued interest on June 15, 2012" and defines an event of default to include NRNS's failure to make a payment on its due date. The Guaranty agreements all state that each Guarantor "absolutely and unconditionally guarantees full and punctual payment and satisfaction of the Indebtedness [all principal, accrued interest and attorney's fees] of Borrower [NRNS] to Lender [Wells Fargo]."

The Court's inquiry into the parties' intent is limited to the four corners of the contract, and contract language is afforded the plain meaning given by a reasonable person. The

interpretation of an unambiguous contract is a question of law for the Court. *Speight, McCue & Associates, P.C. v. Wallop,* 153 P.3d 250, 254-55 (Wyo. 2007) (and cases cited therein). Disputes relating to written loan instruments are "grist for the mill of summary judgment." *Martinez v. Assocs. Financial Svcs. Co.,* 891 P.2d 785, 788 (Wyo. 1995) (granting summary judgment in favor of lender) (citing *Dudley v. East Ridge Development Co.,* 694 P.2d 113, 117 (Wyo. 1985)); *Hayes v. American National Bank* 784 P.2d 599, 604 (Wyo. 1989) (construing language of loan guaranty and ruling that guaranty language was unlimited and unconditional and summary judgment was therefore appropriate).

There is no dispute that Wells Fargo made loan advances totaling $559,486.96 to NRNS, the loan matured and the unpaid balance was due and payable in full on June 15, 2012. Wells Fargo informed NRNS prior to Note maturity that payment was due in full at maturity. Wells Fargo's representative, Glenn Ross, has submitted the TI Loan advance and payment history on the Note and provided testimony (and a calculation) that the unpaid loan balance is $618,481.75 as of October 9, 2013, and interest accrues at the Note default interest rate of 8.50% ($132.10 per day) thereafter. Based on the unambiguous language in the TI Note and Guaranty agreements, Wells Fargo is entitled to summary judgment on its claim for a money judgment against NRNS on the Note and against John H. Schneider, Michelle Schneider, Schneider Limited Partnership, John Schneider Revocable Trust U/A/D November 20, 2007, Michelle Schneider Revocable Trust U/A/D November 20, 2007 and Schneider Management, LLC on the Guaranty agreements.

17

Wells Fargo is also entitled to recover costs and attorney's fees under the TI Note and Guarantys and Wells Fargo will file a motion for those costs and fees following the Court's entry of judgment.

## II.     The Defendants' Fraud in the Inducement Counterclaim Lacks Legal Merit

The fraud in the inducement counterclaim (Defendants' Sixth Claim for Relief) lacks legal merit for a host of reasons.  It is based solely on the allegation that Glenn Ross of Wells Fargo made the oral Conversion Promise in his office in Cody, Wyoming.  To prevail, the Defendants must show that the Conversion Promise was made and that at the time the Conversion Promise was made Wells Fargo had no intention of performing.  The Defendants cannot make that showing.  Rather, the evidence shows that Wells Fargo intended to convert the TI Loan to a long-term loan at the time the TI Loan was approved and was working toward doing so – until the newspapers reported the allegation that the Schneiders had offered to pay off a witness to provide false testimony in the Biles case.  Finally, NRNS is unable to provide admissible evidence it suffered damages from Wells Fargo's refusal to perform the Conversion Promise.

This Court, sitting in a diversity case in Wyoming, applies the Wyoming choice of law rules. *Tolman v. Stryker Corp.,* 926 F.Supp.2d 1255, 1257-58 (D.Wyo. 2013) (citations omitted).  Under Wyoming's choice of law rules, Wyoming law applies because the alleged Conversion Promise was made in Wyoming and Wells Fargo's decision not to convert the TI Loan to a long-term loan took place in Wyoming. *Archuleta v. Valencia,* 871 P.2d 198, 200 (Wyo. 1994).

Mr. Ross' alleged Conversion Promise was that Wells Fargo would at some point in the future convert the TI Loan to a long-term loan.  A promise or statement of one's intention to act in the future, without more, does not support a fraud claim unless the promise is made with no intention of performing.  *Applied Genetics Intern'l, Inc. v. First Affiliated Securities, Inc.,* 912 F.2d 1238, 1244 (10th Cir. 1990) (citing *Meyer v. Ludvik,* 680 P.2d 459, 463 (Wyo. 1984)).  Fraud must be established by clear, unequivocal and convincing evidence.  It is never presumed.  *Rocky Mtn. Helicopters, Inc. v. Air Freight, Inc.* 773 P.2d 911, 919 (Wyo. 1989).  Fraud is established only when a claimant demonstrates by clear and convincing evidence that 1) the other party made a false representation intended to induce action by the claimant, 2) the claimant reasonably believed the representation to be true, and 3) the claimant relied upon the representation and suffered damages. *Metz Beverage Co. v. Wyoming Beverages, Inc.,* 39 P.3d 1051, 1059-60 (Wyo. 2002), 2002 WY 21 ¶ 30 (citations omitted).

### A.      The Defendants Cannot Show That Mr. Ross Made the Conversion Promise

The Defendants' Counterclaim for fraud in the inducement alleges that Glenn Ross verbally guaranteed that the TI Loan would be converted a "low rate" "longer term" loan once construction of tenant improvements was complete.   In their counterclaim, the Defendants state that the Conversion Promise was made on April 24, 2011 and repeated on May 18 and again on May 19, 2011.  [Counterclaim ¶¶ 24, 25].  When deposed, however, these assertions proved to be false.  Dr. Schneider testified that discussions involving converting the TI Loan to a long-term loan took place in late 2009 or early 2010. [Schneider Depo @ 16:2-22; 21:18-22:12].  No further conversations

about converting the TI Loan to a long-term loan ever occurred.  Rather, Dr. Schneider and NRNS 'had [an] ongoing assumption that [the TI Loan] would be converted to a long-term loan… " [Schneider Depo @ 23:4-22].

Not only have the allegations in the Counterclaim proven to be false by Dr. Schneider's own sworn testimony but his requests for many different loan amortization periods after the TI Note was signed dispute the allegation that Mr. Ross promised a 10 or 15 year amortization.  In September of 2011, Dr. Schneider requested a $5,000,000 loan to be repaid over 7 years.  Wells Fargo approved the loan but the loan request was withdrawn when Dr. Biles sued Dr. Schneider.  In March 2012, Dr. Schneider asked Wells Fargo to make a $3,000,000 loan to pay the TI Loan and provide additional funds.  He first asked for a 24 month payment term and then increased it to 36 months.  Finally, he asked Wells Fargo to convert the TI Loan to a five year fixed rate loan at maturity – before the news accounts of witness tampering surfaced.  A person who had been promised a 10 of 15 year term loan would not be seeking long-term loan terms that differ from those previously promised, especially when Dr. Schneider never referred at any time to any promise of a term loan with a longer amortization period.

Dr. Schneider's own testimony and his post-TI Loan closing requests defy the Defendants' ability to satisfy the clear, unequivocal and convincing evidence standard required to support the allegation that Mr. Ross promised to convert the TI Loan to a 10 or 15 year long-term loan.  Further, Mrs. Schneider testified under oath that no one from Wells Fargo represented to her that the TI Loan would be converted to a long-term loan.  Consequently, neither she nor the Michelle Schneider

20

Revocable Trust U/A/D November 20, 2007 holds a fraud in the inducement counterclaim against Wells Fargo.

### B.   Dr. Schneider's Reliance On Mr. Ross's Alleged Conversion Promise Was Unreasonable

Assuming, *arguendo,* that Mr. Ross made the Conversion Promise, the fraud in the inducement counterclaim still fails because Dr. Schneider cannot prove by clear and convincing evidence that his reliance on that promise was reasonable.  Prior to signing the TI Loan Note, Dr. Schneider (along with others) signed the OMNI Project Note.  Under the express terms of the OMNI Project Note, at the end of the 17 month OMNI Project construction period, the debt automatically converted from a short-term loan to a long-term loan with a 20 year amortization schedule, but due and payable in full 10 years after the date of the automatic conversion.  Notably, the OMNI Project Note defines the date the short-term loan changed to a long-term loan as the "Conversion Date" [May 15, 2012].

With a promissory note signed by Dr. Schneider containing that conversion provision, and Dr. Schneider's testimony that Mr. Ross allegedly made the Conversion Promise a year one and a half years before the TI Loan was approved (with no statement of the loan amount [which was unknown], interest rate or repayment term), it is unreasonable for Dr. Schneider to have relied on the alleged Conversion Promise.  A fraud claim cannot be based on a promise which is unenforceable at the time it was made.  *Bridges v. Reliance Trust Co.,* 422 S.E.2d 277, 279-80 (Ga.Ct.App. 1992) (citations omitted, and stating that a promise to make a loan with no specification of the interest rate or maturity date will not support an action for fraud); *see e.g. Doud v. First Interstate Bank of*

*Gillette,* 769 P.2d 927, 928-29 (Wyo. 1989) (oral promise of banker that did not include loan amount, interest rate, repayment schedule and acceptable collateral was unenforceable as a matter of law).

      **C.**      **The Defendants Cannot Prove Wells Fargo Did Not Intend To Convert the TI Loan To A Long-Term Loan**

      The Defendants cannot prove that at the time Mr. Ross allegedly made the Conversion Promise Wells Fargo did not intend to do so.  In fact, the only evidence before the Court shows just the opposite.  At the time the TI Loan was approved, Wells Fargo explicitly stated in its Credit Approval Presentation:  "Upon completion of construction, NRNS may choose ***to restructure the line of credit into a term loan*** facilitated by the Private Bank." (emphasis added) [Depo Exhibit 14, pg. 1].  And, after the TI Loan was made, Wells Fargo first approved a $5,000,000 seven year term loan, part of which would pay the TI Loan balance.  Wells Fargo then began processing Dr. Schneider's request for a 24 month (and then 36 month) loan to NRNS to repay the TI Loan balance and fund NRNS's lease payments for the OMNI Project office suite.  Finally, Wells Fargo requested current financial information from NRNS and the Guarantors "to help precede [sic] with the renewal of the TI loan" - to which Dr. Schneider responded and asked for a "5 year fixed rate loan." [Depo Exhibit 16].  Shortly thereafter, the newspaper articles accusing the Schneiders of witness tampering were published and Dr. Schneider withdrew $2,500,000 from bank accounts, presumably to settle the Biles lawsuit.  Wells Fargo decided at that time, and not before, not to convert the TI Loan to a long-term loan.

A person who acts in justifiable reliance on a promise cannot maintain an action for fraud if the promisor honestly made the promise but "*for any reason changes his mind* and fails or refuses to carry his expressed intention into effect."  (emphasis added) Restatement, Second, Torts § 530 (Misrepresentation of Intention), Comm. b. to Subsection (1).  The intention of the promisor not to perform cannot be proven solely by proof of its nonperformance.  *Id.,* Comm. d.; *Consolidation Services, Inc. v. Keybank Nat'l Assn.,* 185 F.3d. 817, 823 (7th Cir. 1999) ( dismissing fraud claim against bank when bank later decided not to forbear from taking collection action).   Wells Fargo's decision to refuse to convert the TI Loan to a long-term loan was not made until the witness tampering accusations were published and the Schneiders paid off Dr. Biles.

    D.      **The Defendants Cannot Prove Damages**

Assuming, again *arguendo*, that Wells Fargo misrepresented its intention to convert the TI Loan to a long-term loan, NRNS and the Guarantors have the burden of proving damages. *Capshaw v Schieck* 44 P.3d 47, 52 (Wyo. 2002).  Failure to prove damages bars recovery on a tort claim.  *See Champion Ventures, Inc v. Dunn*, 567 P.2d 724, 730 (Wyo. 1977) (dismissing damages claim for conversion due to insufficient and speculative proof).

A claimant is required to prove damages with a reasonable degree of certainty.  The Court cannot award damages by resorting to speculation or conjecture.  *Capshaw*, 44 P.3d at 52; *Cottonwood Valley Ranch*, 874 P.2d 897, 899 (Wyo. 1994).  Damages should compensate for a party's loss and no more.  *WSP, Inc. v. Wyoming Steel Fabricators and Erectors, Inc.*, 158 P.3d 651, 655 (Wyo. 2007); 2007 WY 80 ¶.  A claim for lost profits may be a proper measure of

damages but proof thereof must be based on i) a loss of profits, ii) the amount of lost profits can be determined with a reasonable degree of certainty, and iii) the acts of the damaging party caused the lost profits. *Hopper v. All Pet Animal Clinic, Inc.,* 861 P.2d 531, 547-48 (Wyo. 1993). Calculating the cost and expense of operations is an essential item in proving lost profits. *Id.* at 548. Here, the damages claim is solely for lost revenues, not lost profits. Lost revenues is not a proper measure of damages. In written discovery, Wells Fargo first asked NRNS to explain all damages it claimed. When Dr. Schneider was asked in a later deposition to explain the damages the Defendants claim, Dr. Schneider was unable to state the costs and expenses NRNS saved by terminating the employees that would have generated the lost revenues. Thus, lost profits cannot be determined and no damages evidence can be introduced because the Defendants failed to deduct expenses saved from their damages claim.

Further, the Defendants are required to prove that such alleged lost profits can be determined with a reasonable degree of certainty and that Wells Fargo's refusal to convert the TI Loan to a long-term loan caused the lost profits. *WSP, Inc.* 158 P.3d at 655-56. The Defendants must satisfy the "reasonable probability" standard for lost profits. *Zierke v. Agri-Systems*, 992 F.2d 276, 279 (10th Cir 1993) (citing *Hashimoto v. Marathon Pipe Line Co*., 767 P.2d 158, 165 (Wyo. 1989)). They cannot satisfy that standard because Dr. Schneider testified that 75% of the revenue loss was from adverse publicity concerning the accusations that the Schneiders tampered with the witness in the Biles case and the remaining 25% of lost revenues that they attribute to Wells Fargo was simply a "guesstimate." These facts, and lack of facts, make the Defendants'

damages calculation far from reasonably probable.  At best, they are a mere guess and cannot be proved.  *Coronado Oil Co. v. Grieves*, 642 P.2d 423, 437-438 (Wyo. 1982).

With no ability to prove the elements of their promissory fraud counterclaim by clear and convincing evidence, the Court should grant summary judgment in favor of Wells Fargo on this Counterclaim.

**III.    The Defendants' Breach of Oral Contract Counterclaim is Barred By The Statute Of Frauds And The Parol Evidence Rule Bars Any Evidence Of The Alleged Oral Contract**

In their First Claim for Relief, the Defendants assert that Wells Fargo breached an oral contract to convert the TI Loan to a long-term loan.  That claim is barred by the Statute of Frauds, and the parol evidence rule prevents the Defendants from introducing any evidence of an oral agreement.

According to Dr. Schneider, the alleged oral agreement took place in late 2009 or early 2010 and required Wells Fargo to convert the TI Loan to a long-term loan at the TI Note maturity date – June 15, 2012, which would result in payments over a 10 or 15 year period.  The time for Wells Fargo's performance of the alleged agreement to convert the TI Loan to a long-term loan, and the long-term loan payments, both exceed one year.  Wyoming's Statute of Frauds states that every agreement that by its terms is not to be performed within one year from the date such agreement was made "shall be void" unless the agreement is in writing.  Wyo. Stat. § 1-23-105(a)(i); *see Ames v. Sundance State Bank,* 850 P.2d 607, 610 (Wyo. 1993),; *Birt v. Wells Fargo Home Mortgage, Inc.,* 75 P.3d 640, 650, 2003 WY 102 ¶ 23 (Wyo. 2003) (contract for loan when payments extend beyond one year must be in writing to be enforceable (citations

omitted)).   Accordingly, the alleged oral contract on which the Defendants rely is unenforceable and as a matter of law is barred by the Statute of Frauds.

In addition, the parol evidence rule bars the Defendants from introducing any evidence of the alleged oral agreement.   The parol evidence rule is a rule of substantive law, not a rule of evidence. *Natrona Power Co. v. Clark*, 225 P. 586, 589 (Wyo. 1924).   It bars a party from submitting oral testimony to supplement or contradict terms of a written contract.  *Mullinix LLC v. HKB Royalty Trust*, 126 P.3d 909, 920 (Wyo. 2006); s*ee also, Ames v. Sundance State Bank*, 850 P.2d 607, 609 (Wyo. 1993) (rejecting borrower's contention that course of dealing and banking practices required bank to extend loan maturity date, and court enforced parol evidence rule as well).   The TI Note unambiguously required NRNS to pay the TI Loan balance at maturity. The Defendants' contention that they had an agreement to repay the loan over a 10 or 15 year period contradicts the payment provision of the TI Note.   Consequently, the alleged oral promise of a long-term loan contradicts the written TI Note terms, and the Defendants are barred by the parol evidence rule from introducing contradictory oral evidence. Thus, the Defendants' claim for breach of the alleged oral contract lacks legal merit.

**IV.     The Defendants' Second Claim for Relief (Breach of Implied Covenant of Good Faith and Fair Dealing) Contradicts The Unambiguous TI Loan Note And Is Barred Because No Contract For A Long-Term Loan Exists**

The Defendants' Second Claim for Relief (Breach of Implied Covenant of Good Faith and Fair Dealing) is invalid because it seeks to impose duties contrary to the express terms of the TI Note and because no contract for a long-term loan exists.

Wells Fargo acknowledges that every contract contains a covenant that requires the parties to act in good faith in performing their duties.  A breach of the covenant occurs when a party interferes or fails to cooperate in the other party's performance.  However, NRNS and the Guarantors improperly attempt to create new, independent rights or duties beyond those to which the parties agreed in the TI Note and Guarantys.  Their attempt lacks legal merit.  *See, City of Gillette v. Hladky Construction, Inc.,* 196 P.3d 184, 196 (Wyo. 2008); *Scherer Const., LLC v. Hedquist Const., Inc.,* 2001 WY 23, ¶ 19, 18 P.3d 645, 654 (Wyo. 2001) ("The covenant of good faith and fair dealing may not, however, be construed to establish new, independent rights or duties not agreed upon by the parties." (citations omitted)); *Schuler v. Community First Natl. Bank,* 999 P.2d 1303, 1305 (Wyo. 2000) (relying on *Price v. Wells Fargo Bank,* 213 Cal.App.3d 465, 261 Cal.Rptr. 735, 742 (1989)); *M&M Auto Outlet v. Hill Investment Corp.,* 230 P.3d 1099, 1108-09, 2010 WY 56 ¶¶ 26-27; *see also Alpine Bank v. Hubbell,* 555 F.3d 1097, 1104-05 (10th Cir. 2009) (borrower's implied covenant claim contradicted loan documents, and stating:  "It

27

would beggar the imagination to believe that the Bank, after making so clear in the [loan documents that it owed no duty], was assuming [the same duty it had disclaimed]").

To the extent the Defendants' claim for breach of the covenant applies to the alleged agreement for a long-term loan, their claim fails as well.  The covenant applies only if a contract exists.  "Without a contract, there is no basis for imposition of the implied covenant, whether in contract or in tort, because either cause of action arises out of the contractual relationship." *Birt,* 75 P.3d at 650, 2003 WY 102 ¶ 21.  With no contract for a long-term loan in place Wells Fargo could not breach an implied covenant.

**V.     The Defendants' Promissory Estoppel Claim Fails Because The Alleged Promise Was Too Indefinite And The TI Note Is A Binding Contract, Thereby Foreclosing Promissory Estoppel**

Counterclaim III (Promissory Estoppel) fails as a matter of law because the TI Loan,  as evidenced by the TI Note, is an enforceable contract and because promissory estoppel requires an unambiguous promise calculated to induce reliance. *Ames,* 850 P.2d at 610 (vague promises by bank officer that did not specify essential terms of transaction did not support promissory estoppel claim and could not be relied upon); *Birt,* 75 P.3d at 648 (bank representative's assurance that loan would be approved did not create a contract).   An oral promise of a bank representative does not support a claim of promissory estoppel if the statement does not specify the loan amount, interest rate, repayment schedule and collateral.  *Hulse v. First Interstate Bank of Commerce – Gillette* 994 P.2d 957, 959 (Wyo. 2000) (citing *Doud v. First Interstate Bank of Gillette*, 769 P.2d 927, 928-29 (Wyo. 1989)).  Dr. Schneider testified that the amount of the TI

Loan was not known and no interest rate was promised as the time of the alleged Conversion Promise. Further, promissory estoppel applies only if no contract exists. *Birt,* 75 P.3d at 651. Here, the TI Loan contract does exist. For these reasons, the Defendants' Third Counterclaim lacks legal merit.

**VI.     The Equitable Estoppel Counterclaim Is Invalid Because The Representations On Which Estoppel Is Based Predate The TI Note And The Inability To Obtain A Term Loan Was Caused By The Defendants**

The Defendants also assert a counterclaim for equitable estoppel (Fourth Claim for Relief). This counterclaim is invalid for two reasons. First, it is based on the alleged Conversion Promise by Mr. Ross in 2009 or 2010. The fact that the TI Note was executed after that alleged Conversion Promise bars an equitable estoppel claim. *Birt,* 75 P.3d at 654-55 (citing *McCarty v. Piedmont Mut. Ins. Co.,* 62 S.E. 1 (S.C. 1908) for the proposition that terms of a written contract prevail over prior representations; *Verschoor v. Mountain West Farm Bureau Mut. Ins. Co.,* 907 P.2d 1293, 1298 (Wyo. 1995) (estoppel does not create additional duties to a contract)).

In addition, Wells Fargo refused to convert the TI Loan to a long-term loan only after the newspaper articles reported that the Schneiders had been accused of witness tampering and $2,500,000 had been withdrawn to pay Dr. Biles to settle his lawsuit. The failure to convert the TI Loan to a long-term loan was not caused by Wells Fargo's misrepresentation of its intention. Rather, it was caused by actions of NRNS and the Schneiders which became public when the newspaper articles were published. Equitable estoppel cannot compel Wells Fargo to convert the

TI Loan to a long-term loan when the failure to do so was "largely due to [NRNS and the Schneiders]' own financial difficulties." *Birt,* 75 P.3d at 656.

## VII.    The Defendants' Negligent Misrepresentation Counterclaim Lacks Legal Merit Because It Is Based On The Alleged  Conversion Promise To Act In The Future

The Defendants' final counterclaim is for Wells Fargo's negligent misrepresentation that it would convert the TI Loan to a long-term loan at the TI Note maturity date.  That alleged representation was that Wells Fargo would convert the TI Loan to a long-term loan in the future.  As a matter of law, this counterclaim fails.  The tort of negligent misrepresentation applies only to a misrepresentation of fact.  It does not apply when the misrepresentation is of future intention.  *Id.*  at 657-58 (citing Restatement (Second) of Torts § 552).  Accordingly, the counterclaim for negligent misrepresentation fails as a matter of law.

**CONCLUSION**

Wells Fargo's Complaint for a money judgment against the Defendants is supported by unambiguous written loan documents and undisputed evidence of the unpaid loan balance. The fraud in the inducement counterclaim was invoked to attempt to set aside the TI Loan contracts. For the reasons explained, it fails.  All other counterclaims are barred by the parol evidence rule as well as other reasons set forth in this Memorandum Brief.  As a result, Wells Fargo requests that the Court grant summary judgment in its favor on its Complaint and on all Counterclaims.

Dated this 10th day of October, 2013.

/s/_____
James R. Belcher
Wyoming Bar # 5-2556
CROWLEY FLECK PLLP
237 Storey Boulevard, Ste. 110
Cheyenne, WY  82009
(307) 426-4105
ATTORNEYS FOR WELLS FARGO BANK, N.A.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of WELLS FARGO BANK'S MEMORANDUM BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT was served on Defendants at the time it was filed by the Court's CM/ECF electronic email system to the following:

>   Michael D. Greear
>   David Clark
>   Worrall & Greear, P.C.
>   Attorneys for Defendants

>>>   /s/_____
>>>   James R. Belcher