James R. Belcher
Wyoming Bar # 5-2556
Crowley Fleck PLLP
237 Storey Boulevard, Ste. 110
Cheyenne, WY 82009
(307) 426-4105
(307) 426-4099 (FAX)
Attorneys for Wells Fargo Bank, N.A.
CM/ECF Registered

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| WELLS FARGO BANK. N.A., a national bank, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Case No. 12-CV-221-J |
| NORTHERN ROCKIES NEURO-SPINE, P.C., a Wyoming corporation, JOHN H. SCHNEIDER, MICHELLE SCHNEIDER, SCHNEIDER LIMITED PARTNERSHIP, a Wyoming limited partnership, JOHN SCHNEIDER REVOCABLE TRUST U/A/D NOVEMBER 20, 2007, MICHELLE SCHNEIDER REVOCABLE TRUST U/A/D NOVEMBER 20, 2007, SCHNEIDER MANAGEMENT, LLC, a Wyoming limited liability company, | ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

**JOINT FINAL PRETRIAL MEMORANDUM**

Counsel for the parties in the above captioned matter hereby jointly submit this Joint Final Pretrial Memorandum.

**(a)**     *Jurisdiction and Parties.*

Jurisdiction is proper in this Court under 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between Wells Fargo and all Defendants, and the amount in controversy, exclusive of interest and costs, exceeds Seventy-five Thousand Dollars ($75,000) because Wells Fargo's Complaint seeks a judgment against the Defendants, jointly and severally, on a loan with an unpaid balance of approximately $570,000.00.

**(b)**     *General Nature of the Claims and Contentions of the Parties.*

Wells Fargo claims that Defendant Northern Rockies Neuro-Spine, P.C. is in default on a promissory note payable to Wells Fargo with an unpaid balance of approximately $570,000.00. Wells Fargo claims that Defendants John H. Schneider, Michelle Schneider, Schneider Limited Partnership, a Wyoming limited partnership, John Schneider Revocable Trust U/A/D November 20, 2007, Michelle Schneider Revocable Trust U/A/D November 20, 2007, and Schneider Management LLC, a Wyoming limited liability company (the "Guarantors") guaranteed payment of the NRNS loan and are liable for the unpaid loan balance.

The Defendants claim Glenn Ross made a promise to Dr. Schneider that the TI Loan would be converted to a long-term note upon its maturity, and that Dr. Schneider relied on that promise. It is contended by Defendants that Wells Fargo's failure to made good on that promise has resulted in damages to Defendants. The claims asserted by Defendants are fraud in the inducement, breach of

the covenant of good faith and fair dealing, promissory estoppel, equitable estoppel, and negligent misrepresentation.

    **(c)**    *Uncontroverted Facts.*

The parties agree that the facts below have been stipulated to and admitted and require no proof:

    1.    The banking relationship between John H. Schneider ("Dr. Schneider"), Northern Rockies Neuro-Spine P.C. ("NRNS") and Wells Fargo Bank, N.A. ("Wells Fargo") dates back to 2005-2006. At that time, Dr. Schneider and NRNS established deposit account relationships with Shoshone First Bank in Cody, Wyoming. Wells Fargo is successor by consolidation with Shoshone First Bank. Dr. Schneider also obtained personal loans for real estate purchases and development. Glenn Ross was the primary banker for Dr. Schneider.

    2.    Dr. Schneider became interested in constructing and developing in Billings, Montana a surgery center and physician office complex (the "OMNI Project"). In early 2009, Dr. Schneider initiated discussions with Mr. Ross regarding the possibility of Wells Fargo financing construction of the OMNI Project. After equity capital had been raised for the OMNI Project, the investors created architectural drawings and construction estimates. This process took over one year, at which time Wells Fargo agreed to make a $3,750,000.00 loan for the OMNI Project as evidenced by a Promissory Note dated October 28, 2010. The OMNI Project Note requires monthly payments of interest only from the note date until the May 15, 2012 Conversion Date. At that time, the loan converted from a construction loan to

a term loan requiring monthly payments required to fully amortize the unpaid loan balance over a 20 year term but was due and payable in full in 10 years.

3.   Dr. Schneider discussed with Mr. Ross a loan to NRNS to be used for tenant improvements for NRNS's office suite in the OMNI Project (the "TI Loan").  Dr. Schneider did not know how much money NRNS needed to borrow for tenant improvements but asked at that time that the loan be a long-term loan.

4.   Glenn Ross is the only Wells Fargo representative who allegedly made any promises regarding converting the TI Loan to a long term loan.

5.   It would not be uncommon to extend the maturity date on a loan like the TI Loan into a long-term loan once construction of tenant improvements was complete.

6.   Dr. Schneider did not obtain the final estimate for the cost of the tenant improvements until April of 2011, and in May of 2011 advised Wells Fargo that NRNS requested $850,000.00 for the TI Loan. Wells Fargo then approved the TI Loan for NRNS in that amount.

7.   Wells Fargo's records indicate that the TI Loan would be paid by several sources. It would be restructured into a term loan, or paid from conversion of NRNS's accounts receivable to cash, or paid by the loan guarantors.

8.   Dr. Schneider signed a Promissory Note dated May 23, 2011 ("TI Note") on behalf of NRNS that sets forth the payment terms of the TI Loan. The TI Note requires payment in full on June 12, 2012.  It contains no provision to convert the TI Loan to a long-

term loan at the stated maturity date.

9. Dr. Schneider and the other Guarantors each executed and delivered to Wells Fargo a Commercial Guaranty dated May 23, 2011 (the "Guarantys") in which they promised, jointly and severally, to pay the TI Loan.

10. Under the TI Note and the Guarantys, Wells Fargo is entitled to recover costs and reasonable attorney's fees incurred in collecting the TI Loan.

11. Wells Fargo made loan advances on the TI Loan as funds were needed to construct tenant improvements.

12. After the TI Loan was documented and loan funds advanced, Dr. Schneider asked Wells Fargo for a number of additional loans, some of which included restructuring or combining the TI Loan balance with other loans. In September 2011, shortly after the TI Loan documents were signed, Dr. Schneider asked Wells Fargo to make a $5,000,000 term loan to NRNS, part of which would be used to repay the TI Loan. On December 3, 2011, Wells Fargo approved the $5,000,000 loan request, but Dr. Schneider abandoned this loan request when he was sued by Dr. Jimmie Biles.

13. In March of 2012, Dr. Schneider asked Wells Fargo to make another loan to NRNS, with the loan proceeds to be used to pay the TI Loan and to pay NRNS's lease payment for its office suite in the OMNI Project, payable over a 24 month term. Dr. Schneider initially proposed a 24 month term loan but later changed his request, asking for a 36 month repayment term. Several weeks later, Dr. Schneider again changed this loan

request. He asked Wells Fargo to loan NRNS $3,000,000 to be secured by bank deposits owned by Northern Rockies Insurance Group, not by deposits owned by NRNS. He stated that to meet credentialing criteria, he cannot show that the deposits are assigned elsewhere. He indicated that he would want to keep the collateral confidential.

14.     Wells Fargo never funded any of the requested loans to NRNS other than the original TI Loan.

15.     Wells Fargo began the process of converting the TI Loan to a term loan in the spring of 2012, before it matured on June 15, 2012. Wells Fargo asked for financial information from NRNS and the TI Loan Guarantors. At that time, Dr. Schneider asked Wells Fargo to convert the TI Loan to a 5 year, fixed rate loan.

16.     After Wells Fargo approved the TI Loan and advanced loan funds for tenant improvements, Dr. Schneider and NRNS were subjected to claims of improperly prescribing medication, malpractice and disparagement of another doctor. Dr. Schneider was accused of improperly prescribing pain medicine for a patient on whom he had performed surgery. This resulted in an investigation by the Wyoming Board of Medicine. His license to practice medicine in Wyoming was suspended for 5 weeks in early 2012 and NRNS lost revenues totaling $168,900 as a result of that suspension.

17.     At about the same time the alleged improper prescription of pain medicine took place, Dr. Schneider was sued by Dr. Jimmie Biles.

18.     According to newspaper reports published May 7, 14, 15 and 16, 2012, Dr.

and Mrs. Schneider were accused of improperly instructing a witness in the Biles case to lie in exchange for a large payment. Dr. Schneider was also accused of providing the witness with a note for the witness's personal doctor to sign to excuse her from answering deposition questions. During this time, Dr. Schneider instructed Wells Fargo to withdraw $2,500,000 from his account. Dr. Schneider did not tell Wells Fargo the purpose of doing so. Dr. Schneider never informed Wells Fargo of the allegations brought to the court's attention by his lawyers as reported by newspapers in communities in which Dr. Schneider practiced.

19. Wells Fargo surmised that the Schneiders had paid the $2,500,000 to settle the Biles lawsuit and was concerned how the negative publicity would affect Dr. Schneider and his medical practice entity, NRNS. Consequently, Wells Fargo decided not to convert the TI Loan to a long-term loan and demanded payment from NRNS and the TI Loan Guarantors.

20. Dr. and Mrs. Schneider were asked in their depositions about the Biles lawsuit and how much had been paid to settle that lawsuit. The Schneiders refused to answer any questions and invoked their Fifth Amendment right to remain silent.

21. Neither Michelle Schneider nor the Michelle Schneider Revocable Trust U/A/D November 20, 2007 claim that anyone from Wells Fargo ever represented to them that the TI Loan would be converted to a term loan at the Note maturity.

22. Wells Fargo made loan advances to NRNS totaling $559,486.96 to pay for tenant improvements in the OMNI Project. No principal payments have been paid on the

loan. As of October 9, 2013, the unpaid balance owing on the TI Loan is as follows:

| | |
|---|---|
| Principal | $559,486.96 |
| Interest | $58,994.79 |
| Total | $618,481.75 |

Under the TI Note provisions, interest accrues at the annual rate of 8.50% ($132.10/day) on the unpaid TI Loan balance.

**(d)** *Contested Issues of Fact.*

1. Whether Glenn Ross promised to convert the TI Loan to a long-term loan at the maturity of the TI Note?

2. When did Glenn Ross promise to convert the TI Loan to a long-term loan at the maturity of the TI Note?

3. What were the terms of long-term loan Glenn Ross promised?

4. What damages, if any, did the Defendants suffer as a result of Wells Fargo's refusal to convert the TI Loan to a long-term loan at maturity of the TI Note?

5. At the time Glenn Ross promised to convert the TI Loan to a long-term loan when the TI Note matured, did Wells Fargo expect not to convert the TI Loan to a long-term loan?

**(e)** *Contested Issues of Law.*

State briefly the issues of law in dispute. A memorandum of law may be filed which addresses these issues, if appropriate.

**(f)** *Agreed Applicable Propositions of Law.*

Wyoming law governs the parties' disputes in this case.

The parties do not dispute that if the Court determines the TI Note is an enforceable contract that NRNS and the Guarantors are in default and the TI Loan balance is due and payable in full.

If the Court determines the TI Note is an enforceable contract, the parties agree that the parol evidence rule bars all oral statements that conflict with the unambiguous written terms of the TI Note. The parol evidence rule does not exclude oral statements that are offered as evidence of fraud.

The parties also agree that the Defendants must prove their fraud defense and counterclaim by clear and convincing evidence. To do so, they must prove that i) Glenn Ross (on behalf of Wells Fargo) falsely promised to convert the TI Loan to a long-term loan at maturity of the TI Note, ii) the promise was made to induce NRNS to enter into the TI Loan transaction and to induce each Guarantor to execute and deliver a Guaranty to Wells Fargo, iii) Dr. Schneider reasonably believed the promise to be true, iv) NRNS and the Guarantors to whom the promise was made relied on the promise in entering into and guaranteeing the TI Loan , v) NRNS and the Guarantors to whom the promise was made suffered damages, and vi) at the time Mr. Ross made the promise to convert the TI Loan to a long-term loan Wells Fargo had no intention of converting the TI Loan to a long-term loan.

The parties agree that the covenant of good faith and fair dealing cannot impose duties not agreed upon by the parties, and the covenant applies only if a contract exists.

A claim for promissory estoppel applies only if no contract exists, and such a claim requires an unambiguous promise on which a person relies.

The terms of a written agreement prevail over prior representations that are inconsistent with

the written agreement.  Thus, a claim for promissory estoppel is barred when a written agreement is entered into after an inconsistent promise on which the complaining party relies, and estoppel cannot create duties beyond those expressed in the later, inconsistent contract.

A negligent misrepresentation claim applies only to a misrepresentation of fact.  It fails when the misrepresentation is of an intention to perform in the future.

Damages should compensate for a party's loss and no more.  Damages must be proven with a reasonable degree of certainty and cannot be based on speculation, or a mere guess.  The Defendants' claim for lost profits must demonstrate that Wells Fargo caused the lost profits and calculation of cost and expense of operations is essential to prove a damages claim for lost profits.

The economic loss doctrine bars tort claims that are the subject matter of a contractual agreement.

Wyoming's Statute of Frauds bars a claim for an oral contract for a loan when loan payments extend beyond one year.

The parties will provide the Court with trial briefs on any propositions of law the Court requests or that arise at the pretrial conference or at trial.

**(g)** *Exhibits.*

Copies of the parties' exhibit lists are attached to this Joint Pretrial Memorandum, with the exhibits  listed and marked in accordance with Local Rule 16.2(b)(3).

**(h)** *Depositions.*

Wells Fargo expects to use portions of the deposition transcripts of John Schneider and

Michelle Schneider as statements of an adverse party to prove its case or to rebut testimony of the Schneiders at trial.

The Defendants expect to use portions of the deposition transcript of Glenn Ross as statements of an adverse party to prove their defenses and counterclaims or to rebut testimony of Mr. Ross at trial.

**(i)** *Discovery.*

Discovery has been completed, unless the Court decides that additional discovery should be allowed regarding the damages the Defendants are entitled to provide at trial if the Court denies Wells Fargo' motion in limine to exclude evidence of damages.

**(j)** *Witnesses.*

Each party has listed and attached to this Joint Final Pretrial Memorandum the names and addresses of witnesses, indicating whether the witness will or may be called, including a brief statement of the subject matter and substance of the testimony of each listed witness.

**(k)** *Amendments to Pleadings.*

No request to amend pleadings has been made since the time the Defendants amended their Answer and Counterclaims after Wells Fargo filed a motion to dismiss the Defendants' fraud defense and counterclaim.

**(l)** *Motions in Limine.*

Wells Fargo has filed a motion in limine contemporaneously with filing this Joint Pretrial Memorandum to exclude any evidence of damages claimed by the Defendants.

**(m)** *Pending Motions.*

In addition to Wells Fargo's motion in limine, Wells Fargo's motion for summary judgment has been filed, the Defendants filed a response and Wells Fargo filed a reply. Wells Fargo also filed a Motion to Strike related to the motion for summary judgment and the Defendants filed a response. Both motions are pending.

**(n)** *Jury Instructions.*

This is not a jury trial.

**(o)** *Other Matters.*

The parties have not identified any other matter that the parties believe should be considered by the Court and discussed during the Final Pretrial Conference.

**(p)** *Trial Setting.*

The trial will be non-jury.

The probable length of trial is two days.;

Witnesses should be available for trial on February 12, 2014.

**(q)** *Settlement.*

The parties have exchanged several settlement offers but settlement progress has been unfruitful. It is unlikely the case can reasonably be expected to settle.

Dated this 29th day of November, 2013.


\_\_/s_____
James R. Belcher
Wyoming Bar # 5-2556
Crowley Fleck PLLP
COUNSEL FOR PLAINTIFF WELLS FARGO BBANK


\_\_\_/s_____
David M. Clark
Wyoming Bar # 6-4133
Worrall & Greear, P.C.
COUNSEL FOR DEFENDANTS NRNS and GUARANTORS